UNITED STATES of America, Appellee,

v.

Vincent HURLEY, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Carlo DeMARCO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

James SACCOCCIO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Stanley CIRELLA, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Kenneth SACCOCCIO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Stephen PIZZO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Donna SACCOCCIA, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Anthony DeMARCO, Defendant, Appellant.

Nos. 93–1511, 93–2206, 94–1508, 93–1560–93–1563, 93–1616, 93–1617, 93–2207, 94–1507 and 94–1388.

United States Court of Appeals, First Circuit.

Heard Feb. 7, 1995.

Decided July 24, 1995.

Terrance Reed, Washington, DC and Edward C. Roy, Providence, RI, with whom

Reed & Hostage, Washington, DC, Roy & Cook, James T. McCormick, McKenna & McCormick, Michael C. Andrews, Mary June Ciresi, Vincent Indeglia, Indeglia & Associates, Providence, RI, Richard Inglis, and Gargiulo, Rudnick & Gargiulo, Boston, MA, were on joint briefs, for appellants Donna Saccoccia, Stanley Cirella, Kenneth Saccoccio, Vincent Hurley, James Saccoccio, Carlo DeMarco and Stephen Pizzo.

Robert D. Watt, Jr., Providence, RI, for appellant Anthony DeMarco.

Kathleen A. Felton, Criminal Div., Appellate Section, Dept. of Justice and Michael P. Iannotti, Asst. U.S. Atty., with whom Sheldon Whitehouse, U.S. Atty., James H. Leavey and Michael E. Davitt, Asst. U.S. Attys., Providence, RI, and John P. Elwood, Dept. of Justice, Washington, DC, were on joint brief, for U.S.

Before SELYA, CYR and BOUDIN, Circuit Judges.

BOUDIN, Circuit Judge.

The eight appellants challenge their convictions, sentences and forfeitures for their participation in an extensive money laundering operation organized by Stephen Saccoccia. His conviction and sentence were affirmed in *United States v. Saccoccia,* 58 F.3d 754 (1st Cir.1995). In this case, we affirm the convictions of the eight appellants before us, their sentences, and the forfeiture orders entered against them.

## I. BACKGROUND

The eight appellants are Donna Saccoccia (wife of Stephen), her brother Vincent Hurley, James Saccoccio and his brother Kenneth Saccoccio, Carlo DeMarco and his brother Anthony DeMarco, Stanley Cirella and Stephen Pizzo. Along with Stephen Saccoccia and others, appellants were indicted on November 18, 1991, and were charged with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). Certain of them were also charged with substantive counts of money laundering, 18 U.S.C. §§ 1956–57, currency reporting offenses, 31 U.S.C. § 5324, and interstate travel in aid of racketeering, 18 U.S.C. § 1952.

One conspirator originally charged, David Izzi, pled guilty before trial and testified for the government. Stephen Saccoccia was severed and tried separately due to the illness of his counsel. Alfred Gabriele, added as a conspirator in a superseding indictment, was also tried separately, and his appeal is still pending. *United States v. Gabriele,* No. 94–1215 (1st Cir.). The end result was that the eight appellants in this case were tried together in the district court in Rhode Island. Trial began on November 6, 1992, and ended in a jury verdict on December 18, 1992.

At trial, the government's evidence consisted primarily of the testimony of other participants in the money laundering activities, of Colombian nationals involved in the international drug trade, and of bank employees. The government also offered bank records of financial transactions and numerous court-ordered wiretap recordings. Viewed in the light most favorable to the verdicts, *United States v. Valerio,* 48 F.3d 58, 63 (1st Cir. 1995), the evidence permitted a reasonable jury to find the following.

Stephen Saccoccia owned and controlled a number of precious metals businesses, including Saccoccia Coin Company in Cranston, Rhode Island ("Saccoccia Coin"); Trend Precious Metals in Cranston and in New York, New York ("Trend"); and International Metal Marketing ("International Metal") and Clinton Import/Export in Los Angeles, California ("Clinton Import/Export"). In the late 1980s, after some indirect dealings, Stephen Saccoccia began laundering drug money for Duvan Arboleda, a Colombian narcotics dealer. The laundering operation, ultimately expanded to serve a second drug ring as well, took several forms but each began with Stephen Saccoccia receiving large amounts of cash in New York, generated from the sale of cocaine. Often, Saccoccia would send one of his employees,

usually unindicted co-conspirator Richard Gizzarelli, to a prearranged location, such as a street corner, to meet a customer's courier. Gizzarelli would bring the cash to the Trend office in New York or to Saccoccia's apartment in New York to count it.

The money then followed two different routes. Some of the cash would be used to purchase money orders or gold; the gold and some of the remaining cash would then be shipped to International Metal in Los Angeles. Much of the rest of the cash—up to $200,000 per day—would be sent to Trend and Saccoccia Coin in Rhode Island, either through armored car service or in the car of a Saccoccia employee.

Once the cash reached Rhode Island, it was counted by Saccoccia employees and divided into a number of packets in amounts either greater than or less than $10,000. Most of the cash went to the Trend office in Cranston. Saccoccia employees, directed by Izzi, then drove to local banks where they purchased cashier's checks in amounts less than $10,000 payable to Trend, or cashier's checks in amounts greater than $10,000 payable to companies nominally owned by Hurley. The purpose of these maneuvers— called "smurfing" in law enforcement parlance—was to avoid or minimize the filing of accurate currency transaction reports, which are required by federal law for cash deposits in amounts of $10,000 or more.

Ultimately the local Rhode Island checks would be deposited in, and money from the Hurley accounts wired to, the Trend account at Citizens Bank in Rhode Island. A smaller portion of the cash sent to Rhode Island went to Saccoccia Coin. That cash was used to buy gold without documentation; the gold was then resold to legitimate companies in exchange for checks recorded as payments for gold sales. Some of the cash was also used in the ordinary operations of the Saccoccia Coin Shop, a heavily cash-based enterprise.

At the Los Angeles end, the gold sent to International Metal was sold, and the proceeds were wired back to the Trend account at Citizens Bank. Cash received by International Metal was used to purchase gold covertly, the gold was then sold, and the proceeds were also wired to the Trend account. Thus, the bulk of the cash that Saccoccia sent out of New York eventually ended up in the Trend account at Citizens. Citizens Bank closed the Trend account in April 1991. Thereafter, cash was still transported from New York and "smurf" employees in Rhode Island still obtained cashier's checks from various banks, but the checks were sent to International Metal and Clinton Import/Export in Los Angeles.

Donna Saccoccia assisted her husband in most aspects of the operation, relayed his instructions to the others and wired funds abroad to Colombian banks. Hurley and Anthony DeMarco picked up cash from couriers in New York and transported it to Rhode Island. Hurley, Anthony and Carlo DeMarco, Kenneth and James Saccoccio, Cirella and Pizzo received the cash deliveries in Rhode Island, counted the money, and separated it into packets of smaller amounts for transport to local banks. Anthony DeMarco and James and Kenneth Saccoccio bought the bulk of the cashier's checks.

A staggering amount of money moved through this laundering operation. Between March 1, 1990, and August 22, 1991, Stephen or Donna Saccoccia wired over $136 million to foreign bank accounts primarily in Colombia; more than $97 million of this amount was wired from the Trend account in Citizens Bank jointly controlled by Donna and Stephen. Apart from the $136 million, substantial sums were retained by the Saccoccias and their employees as compensation.

All eight appellants were convicted of RICO conspiracy. All but Carlo DeMarco and Pizzo were convicted of substantive offenses. After post-trial motions, appellants were sentenced in May 1993, and forfeiture judgments against each appellant were entered pursuant to the RICO forfeiture statute, 18 U.S.C. § 1963, and in some cases under the money laundering forfeiture statute. 18 U.S.C. § 982. Appellants' substantive convictions (in addition to RICO conspiracy), their sentences, and their forfeiture amounts are listed below:

| Name | Substantive conviction | Sentence | Forfeiture amount |
|---|---|---|---|
| Donna Saccoccia | 13 counts of money laundering (18 U.S.C. § 1956), and 47 counts of unlawful transactions (§ 1957). | 14 yrs., 2 yrs. supervised release | $136,344,231.86 |
| Vincent Hurley | 1 count structuring (31 U.S.C. § 5324(3)), and 1 count of interstate travel in aid of racketeering (18 U.S.C. § 1952). | 18 yrs., 3 yrs. supervised release | $136,344,231.86 |
| James Saccoccio | 15 counts of structuring. | 10 yrs., 3 yrs. supervised release | $ 37,456,100.79 |
| Kenneth Saccoccio | 14 counts of structuring. | 12 yrs., 3 yrs. supervised release | $ 37,456,100.79 |
| Stanley Cirella | 1 count of structuring. | 9 yrs., 2 yrs. supervised release | $ 37,456,100.79 |
| Anthony DeMarco | 5 counts of filing false currency transaction reports (31 U.S.C. § 5324(2)); 2 counts of structuring. | 7 yrs., 3 yrs. supervised release | $136,344,231.86 |
| Carlo DeMarco | No substantive conviction. | 6.5 yrs., 2 yrs. supervised release | $ 3,927,357.55 |
| Stephen Pizzo | No substantive conviction. | 8.5 yrs., 3 yrs. supervised release | $ 37,456,100.79 |

These appeals followed.

## II. THE RICO ISSUES

The RICO conspiracy offense charged in this case required the government to prove an agreement by appellants "to conduct or participate ... in the conduct of [an] enterprise's affairs through a pattern of racketeering activity"; and the pattern alleged in this case required proof of two or more criminal acts by an appellant (*e.g.*, money laundering or structuring). *See* 18 U.S.C. §§ 1961(1), 1962(c), (d). Appellants here challenge the indictment, the instructions and the evidence relating to RICO.

### A. *The RICO Indictment*

■ The RICO conspiracy count alleged the formal requisites of the offense including the assertion that each appellant agreed to commit at least two racketeering acts; but it did not specify which predicate acts each appellant committed or agreed to commit. Hurley, Cirella, Pizzo and Carlo DeMarco argue that this lack of specificity is fatal to the indictment because a sufficient indictment must "fairly inform[ ] a defendant of the charge against which he must defend...." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974).

In count I, the indictment identified the enterprise, its precise method of operation, the role played by each appellant, and the nature of the predicate acts charged. In appended lists specifically referenced in count I, the indictment also set forth thousands of individual bank transactions and wire transfers. What was lacking was any identification of the particular transactions in which the four complaining appellants were involved, since they acted mainly as counters and subdividers of money deposited and transferred by others.

But if a defendant were charged with conspiring to distribute drugs, it would surely be enough to show that he had acted as a packer in the drug-making "factory" during the period in which a series of identified shipments were made. The government might never know which particular shipments had been packed by the defendant; but his agreement to participate in distributing multiple shipments could fairly be inferred. The same principle applies in this case. There is, we note, no indication that appellants were mis-

led or left in ignorance about what the government intended to prove.

*United States v. Winter,* 663 F.2d 1120 (1st Cir.1981), *cert. denied,* 460 U.S. 1011, 103 S.Ct. 1249, 1250, 75 L.Ed.2d 479 (1983), relied on by appellants, is not in point. In that case we held that the indictment of two defendants failed because "a RICO conspiracy count must charge as a minimum that each defendant agreed to commit two or more specified predicate crimes." *Id.* at 1136. In *Winter* the indictment did not charge even in the most general terms that certain defendants had agreed to commit two predicate acts. Here, the indictment did so charge, and *Winter* is not in point.

### B. The RICO Instructions: "Conduct or Participate"

The gravamen of the underlying offense is "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs" through a pattern of racketeering activity. 18 U.S.C. § 1962(c). In *Reves v. Ernst & Young,* — U.S. —, —, 113 S.Ct. 1163, 1172, 122 L.Ed.2d 525 (1993), the Supreme Court interpreted the words "conduct or participate" and held that they require the defendant's "participat[ion] in the operation or management of the enterprise itself." *Reves* involved a civil RICO suit against an outside accounting firm hired to audit the books of an allegedly corrupt enterprise. Construing *Reves,* we held in *United States v. Oreto,* 37 F.3d 739, 750 (1st Cir. 1994), *cert. denied,* — U.S. —, 115 S.Ct. 1161, 130 L.Ed.2d 1116 (1995), that insider employees who are "plainly integral to carrying out" the racketeering activities fit within section 1962(c).

■ Here, appellants claim that the district court's instruction on the meaning of "conduct or participate" was erroneous in light of *Reves.* No objection to the instruction was made at trial, so we review only for "plain error," Fed.R.Crim.P. 52(b), which requires appellants to show that an error was made, the error was clear or obvious, and the error resulted in prejudice—that is, it affected the defendant's substantial rights. *United States v. Olano,* — U.S. —, — —, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993). Even then, an appeals court need not notice the error unless it caused "a miscarriage of justice" or undermined "the fairness, integrity or public reputation of judicial proceedings." *Id.* at — — —, 113 S.Ct. at 1778–79.

■ The instruction in this case was similar to the one we upheld in *Oreto.* 37 F.3d at 750. The difference—which appellants deem crucial—is that the *Oreto* instruction encompassed defendants who perform acts "necessary to or helpful in the operation of the enterprise," whereas the instruction in this case encompassed defendants who perform acts "related to the operation of the enterprise." Appellants argue that the court's language embraced precisely the view that *Reves* rejected: "that almost any involvement in the affairs of an enterprise [satisfies] the 'conduct or participate' requirement." *Reves,* — U.S. at —, 113 S.Ct. at 1169.

In the abstract, the relatedness reference might pose a problem if a defendant were arguably an outsider, such as the independent auditor in *Reves.* But in this case the government's version of the evidence placed appellants squarely in the role of employees of the enterprise. The jury's verdict shows that the jury accepted that version of events, making the alleged ambiguity in the instructions harmless. To the extent that appellants are challenging *Oreto*'s reading of *Reves, Oreto* is the law of this circuit. *See United States v. De Jongh,* 937 F.2d 1, 6 (1st Cir.1991) (newly constituted panels bound by prior panel decisions in point).

### C. The RICO Instructions: Knowledge

■ Appellants complain about two aspects of the district court's instructions on knowledge. First, they challenge the use of a general "willful blindness" instruction and the court's refusal to instruct the jury that willful blindness did not apply to the RICO conspiracy count. They say that one cannot simultaneously be willfully blind to a conspiracy and also intend and agree to join the conspiracy.

The district judge first instructed the jury on the substantive counts. He then gave a detailed explanation of the RICO conspiracy count, including the requirement that the government prove both "an intent to agree" and "an intent to commit the substantive offenses that are the objects of the conspira-

cy." The judge told the jury that they could not infer knowledge of the conspiracy from negligence, mistake, or ignorance; instead, the defendant must act "voluntarily and intentionally." After lengthy instructions on the RICO count, the judge moved on to more general propositions. Only then did he give the "willful blindness" instruction:

In deciding whether a Defendant acted knowingly, you may infer that the Defendant had knowledge of a fact if you find that the Defendant deliberately closed his eyes to a fact that would have been obvious to him.

The willful blindness instruction appears to have been aimed at the "knowing" requirements of substantive counts. *E.g.,* 18 U.S.C. § 1956 (money laundering). Appellants have given us no reason to think that it diluted the express "intent" requirement for the conspiracy count. Here the trial judge adequately guarded against that risk with cautionary instructions stressing that the defendants must have joined the conspiracy intentionally, *see United States v. Brandon,* 17 F.3d 409, 451–54 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 80, 81, 130 L.Ed.2d 34 (1994), and we see no way that the jury could have convicted without finding deliberate agreement.

■ Second, appellants object to the district court's refusal of their request for an instruction that each appellant had to know of the existence and general nature of the enterprise. When this request was made after the charge, it was entangled with other requests and the district court may not have focused on the request or may have thought it had in substance been given. Although nothing in the statute explicitly requires such knowledge, there is some precedent, including a comment from this court, suggesting it is appropriate. *See, e.g., Brandon,* 17 F.3d at 428; 2 L. Sand, J. Siffert, W. Loughlin & S. Reiss, *Modern Federal Jury Instructions* ¶ 52.04 at 52–39 & comment (1995).

We think that in substance the jury was told, although somewhat indirectly, that appellants had to be aware of the enterprise and its general character in order to be guilty under the RICO conspiracy charge. The court instructed that the first element

that the jury had to find was that a conspiracy existed "to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity." The court subsequently told the jury that the government must also prove "that the defendant knew the conspiracy existed and knew of its unlawful purpose."

Perhaps in theory one might imagine a defendant who knew of and joined in a conspiracy to conduct an enterprise but did not know the nature of the enterprise. In this case, however, the government's evidence showed that appellants knowingly engaged in structuring transactions on an ongoing basis within the framework of Stephen Saccoccia's business venture. Given the evidence accepted by the jury, there is no doubt that appellants knew what they were doing and knew they were doing it within the framework of the Saccoccia organization. If the instruction deviated from perfection, the deviation was assuredly harmless.

### D. *The RICO Instructions: Single or Multiple Conspiracies*

■ At trial, the government offered evidence of out-of-court statements by several persons whom it characterized as unindicted co-conspirators. The most important were two regional managers of rival drug cartels each of which supplied money to be laundered by Stephen Saccoccia's organization. The district court admitted the hearsay under the co-conspirator exception, Fed.R.Evid. 801(d)(2)(E), pursuant to *United States v. Petrozziello,* 548 F.2d 20 (1st Cir.1977). The court found that the regional managers were, more probably than not, members of the Saccoccia conspiracy and rendered a final *Petrozziello* ruling at the close of evidence.

Appellants say first that the two drug ring managers could not conceivably be members of the same conspiracy with each other because the rings were rivals. The government responds that the hearsay exception does not require that the conspiracy used to support the hearsay evidence be the same as that charged, *see United States v. Dworken,* 855 F.2d 12, 24 (1st Cir.1988), and that at the very least that each drug dealer necessarily

conspired with the members of the Saccoccia organization. Whether the government's premise of separate conspiracies is sound or squares with what the district court found is not evident from its brief.

Nevertheless, appellants—who bear the burden on appeal of showing error in the *Petrozziello* finding—make no serious effort to show that the two drug dealers could not have been part of the same conspiracy; their alleged rivalry is hardly conclusive because it is not necessary that all co-conspirators know of each other's existence, *Brandon,* 17 F.3d at 428. Whether a conspiracy's customers are also members of the conspiracy is a fact-based question, *see United States v. Moran,* 984 F.2d 1299, 1303 (1st Cir.1993), and once again appellants make no effort to muster the evidence on this issue, or even to argue it.

■ Alternatively, appellants argue that the court should at least have given a multiple conspiracy instruction, an argument reinforced—although perhaps only superficially—by the government's defense of the hearsay declarations. The government says that this issue was not raised in a timely fashion and that there was no factual basis for a multiple conspiracy instruction. In declining to give such a charge, the trial judge rested on both of these grounds and found, in addition, that the proposed multiple conspiracy instruction was itself deficient.

The district court could be sustained on any one of these three grounds but we think that untimeliness is sufficient, *United States v. Akers,* 987 F.2d 507, 513 (8th Cir.1993); *Yoffe v. United States,* 153 F.2d 570, 576 (1st Cir.1946), and add two further points. First, the request for such an instruction was not made until after government counsel had completed his closing argument, making it impossible for him to address the jury on this point. Second, the core of the government's case tended to show an overarching conspiracy; and appellants make little effort in their brief to show that multiple conspiracies were a serious possibility.

### E. *Sufficiency of the Evidence*

In reviewing sufficiency claims, we normally consider the evidence "in the light most favorable to the prosecution" and then ask whether the evidence "would allow a rational jury to determine beyond a reasonable doubt that the defendants were guilty as charged." *United States v. Mena Robles,* 4 F.3d 1026, 1031 (1st Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1550, 128 L.Ed.2d 199 (1994). Although appellants deny that any of them "directed" the enterprise, we rejected this legal premise in *Oreto,* holding that an employee can "conduct" or "participate" in the conduct of an enterprise by playing an integral role in its operation. 37 F.3d at 750. By *Oreto*'s test, a rational jury could convict each appellant.

■ Donna Saccoccia relayed her husband's instructions to other appellants on numerous occasions, helped count money, and personally authorized the wire transfer of more than $38 million from the Trend account to foreign bank accounts. Hurley and Anthony DeMarco received and counted the large cash deliveries in New York and helped transport the cash to Rhode Island. James and Kenneth Saccoccio and Anthony DeMarco did most of the legwork involved in money laundering, exchanging millions of dollars in cash for cashier's checks at various banks. Carlo DeMarco travelled to New York and Connecticut to transport the cash; Cirella and Stephen Pizzo received and counted money at the coin shop.

■ Four appellants argue that apart from their low levels of responsibility, the evidence was insufficient to show knowledge on their part that the Saccoccia organization was engaged in money laundering or that the money being laundered was derived from narcotics. These claims are made by Cirella, Pizzo and James and Kenneth Saccoccio in order to defeat the showing of predicate acts available to the jury to underpin their RICO convictions. Each of the four says or implies that he was unaware of money laundering but working for what he understood to be a legitimate business.

The jury was entitled to find that these four appellants knew that they were engaged in unlawful money laundering. Stephen Saccoccia discussed with Cirella and Pizzo, among others, how to avoid police detection;

and Pizzo and Cirella discussed "washing . . . the money" and means of avoiding jail. James and Kenneth Saccoccio were involved in so many deposits and manipulative subdividings of funds that laundering was the only plausible explanation. Further, in one instance (July 10, 1990), discussing the division of $54,000 into packages of $9,000 for deposit, James and Kenneth Saccoccio conducted the following (recorded) conversation with Izzi:

> James: 54, I can't do that. He wants me to do $9,000 at every bank, that's stupid! (voices fade out)
>
> James: KENNY, you want me to do 9 at every bank?
>
> Kenneth: (unintelligible) $54,000 that's the way I been doing it. Use VOGUE, do VOGUE, (unintelligible).
>
> Izzi: Not all of it, do a couple of TRENDS if you could.

As for the drug-based origins of the cash, the direct evidence of knowledge among the underlings is much thinner since none of the conspirators were directly involved with the narcotics sales. Kenneth Saccoccio is an exception since he was recorded, while counting cash at Trend, referring to it as "drug money"; and in one conversation with Pizzo, Cirella said something that the jury might have taken as referring to the drug origins of the proceeds. In the case of James Saccoccio, the imputation of knowledge of drugs rests on the vast sums involved in the laundering and James' close association with Kenneth.

There are plenty of cash-generating businesses but among those that require the illicit laundering of funds, the drug business is notorious and preeminent. In this case, the evidence showed that narcotics were the source of the cash and that this fact was well known to Stephen Saccoccia and Kenneth Saccoccia, among others. We think that a rational jury could conclude that James too knew of the money's origins, either from the size and continuing nature of the deliveries, or from being told that the money came from drugs; and Cirella and Pizzo are *a fortiori* cases.

## III. CURRENCY TRANSACTION REPORT ISSUES

The Bank Secrecy Act requires domestic banks to report any transactions involving more than $10,000 in cash, 31 U.S.C. § 5313; 31 C.F.R. § 103. The statute also prohibits customers from providing false information for a bank's report. 31 U.S.C. § 5324(2).[1] Further, under the 1986 amendments, "[n]o person shall for the purpose of evading the reporting requirements of [the Act or its regulations] . . . (3) structure or assist in structuring . . . any transaction with one or more domestic financial institutions." *Id.* § 5324. The most common method of "structuring" is to divide sums of cash into amounts that are either under the $10,000 reporting threshold or into amounts that are larger but still less likely to attract attention.

Structuring is a criminal act, 31 U.S.C. § 5322(a), and a violator is subject to double the fine and sentence if he or she structures while violating another federal law or as part of a pattern of crime. *Id.* § 5322(b). Appellants Hurley, James and Kenneth Saccoccio, and Cirella were convicted of structuring under 31 U.S.C. §§ 5324(3) and 5322(b), and now challenge their convictions on several grounds.

### A. Due Process and Self–Incrimination

Appellants first contend that the reporting requirement violates the Fifth Amendment by requiring them to provide incriminating information to the government about themselves. The Supreme Court has not directly decided this issue as to bank customers, *see California Bankers Ass'n v. Shultz*, 416 U.S. 21, 73, 94 S.Ct. 1494, 1523, 39 L.Ed.2d 812 (1974), but every circuit to consider the claim has rejected it on one of several alternative grounds. *E.g.*, *United States v. Camarena*, 973 F.2d 427, 428 (5th Cir.1992); *United States v. Mickens*, 926 F.2d 1323, 1331 (2d Cir.1991), *cert. denied*, 502 U.S. 1060, 112

---

1. In late 1992, Congress recodified sections 5324(1)–(3) as sections 5324(a)(1)–(3) without substantive change, Pub.L. 102–550, § 1525(a), 106 Stat. 3672, 4064 (Oct. 28, 1992). For simplicity, we refer to the earlier codification, under which appellants were indicted and convicted, unless otherwise noted.

S.Ct. 940, 117 L.Ed.2d 111 (1992); *United States v. Hoyland,* 914 F.2d 1125, 1130 (9th Cir.1990).

In our complex society, individuals are called upon to provide information to the government on countless occasions and under a great variety of circumstances. Where Congress has framed a disclosure requirement narrowly focused upon criminal conduct, the Supreme Court has on occasion struck down such statutes. *Haynes v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968); *Marchetti v. United States,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Albertson v. Subversive Activities Control Bd.,* 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965). But where the conduct is not inherently criminal, the Court has upheld the statutes even where the reporting could in due course lead the government to uncover criminal conduct. *California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971); *United States v. Sullivan,* 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927).

*Byers,* the most recent of the cases on point, upheld a California hit and run law that required motorists involved in an accident to halt and provide their names and addresses to authorities. Needless to say, a fair portion of those involved in such accidents may be identifying themselves in situations that could result in criminal jeopardy. But the Court found that the report required was not itself a confession of criminal conduct, and that the law was directed to all auto drivers in the state rather than a more limited group "inherently suspect of criminal activities." *Byers,* 402 U.S. at 430, 91 S.Ct. at 1539 (quoting *Albertson,* 382 U.S. at 79, 86 S.Ct. at 199).

Of course, a witness may invoke the Fifth Amendment based on fairly remote risks, *see In re Kave,* 760 F.2d 343, 354 (1st Cir.1985), but reporting statutes play a central role in the administration of government (*e.g.,* taxes), and the jurisprudence that governs them has followed a different course. And although the 1986 structuring amendments were aimed at money laundering, *see Ratzlaf v. United States,* — U.S. —, — – —, n. 11, 114 S.Ct. 655, 660–61 n. 11, 126 L.Ed.2d 615 (1994), they reinforce a reporting statute—the Bank Secrecy Act—that has larger aims including tax and regulatory concerns. Many of the reports are filed by legitimate cash-oriented businesses and the report itself is not inherently more incriminating than the accident report upheld in *Byers.*

Anthony DeMarco makes a different constitutional attack on the statute. He was convicted of five counts of willfully "caus[ing] or attempt[ing] to cause" a bank to file a false report. 31 U.S.C. § 5324(2). The bank report, based on information that the teller secures from the customer, asks "on whose behalf" the transaction is being conducted. Anthony DeMarco told bank tellers that the transactions were being conducted on his own behalf but the evidence showed that they were being conducted for Stephen Saccoccia. Anthony DeMarco claims that the "on whose behalf" language is unconstitutionally vague.

Due process requires that criminal statutes define offenses with sufficient clarity that an ordinary person can understand what conduct is prohibited. *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). The "on whose behalf" language is reasonably clear and, on the present facts, plainly pointed to Stephen Saccoccia. The cases DeMarco cites all involve prior versions of the reporting form, which used different language. *E.g., United States v. Murphy,* 809 F.2d 1427, 1430 (9th Cir. 1987) ("for whose account"). The current version of the form was promulgated to remedy this ambiguity. *United States v. Belcher,* 927 F.2d 1182, 1186–88 (11th Cir.), *cert. denied,* 502 U.S. 856, 112 S.Ct. 170, 116 L.Ed.2d 133 (1991).

### B. *Instructions: Willfulness*

Appellants next argue that the district court erred in instructing the jury on willfulness as an element in a structuring violation. Last year, the Supreme Court rejected the majority view of the circuits and held that for a structuring conviction a defendant must know that what he is doing is illegal. *Ratzlaf,* — U.S. at —, 114 S.Ct.

at 658.[2] The district court's instruction, given before *Ratzlaf,* told the jury that, in addition to knowledge, willfulness was required and continued:

> An act is done willfully if its done knowingly and with an intent to do something the law forbids. It requires something more than mere negligence or mistake. It requires proof that a Defendant acted with the purpose of either disobeying or disregarding the law.

No objection was made to this instruction, so we review for plain error. This case does not present the conundrum of a failure to object followed by a wholly unexpected change of law; one month before the trial in our case, this court had an *en banc* argument to consider the scienter requirement in the structuring statute. *See United States v. Aversa,* 984 F.2d 493 (1st Cir.1993) (*en banc*) (anticipating *Ratzlaf*'s result), *vacated,* — U.S. —, 114 S.Ct. 873, 127 L.Ed.2d 70 (1994). In *United States v. Marder,* we recently applied the plain error standard to a pre-*Ratzlaf* instruction, 48 F.3d 564, 572 & n. 5 (1st Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 1441, 131 L.Ed.2d 320 (1995), as have a number of circuits. *E.g., United States v. Retos,* 25 F.3d 1220, 1228–32 (3d Cir.1994).

It is not certain that the district court erred at all. *Aversa* held that "reckless disregard" of the law satisfied the willfulness requirement of the structuring statute. 984 F.2d at 502. The Supreme Court in *Ratzlaf* referred to *Aversa* as a case requiring knowledge, — U.S. at — n. 1, 114 S.Ct. at 657 n. 1; and it cited with approval, *id.* at —, 114 S.Ct. at 659, another First Circuit case in which we agreed that a jury could "infer knowledge if a defendant consciously avoided learning about the reporting requirements." *United States v. Bank of New England, N.A.,* 821 F.2d 844, 855 (1st Cir.), *cert. denied,* 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987).

*Ratzlaf* did not formulate any precise instruction. Should the Supreme Court address the issue again, it might insist on actual knowledge and nothing less. But "disobey or disregard" is part of a standard instruction on willfulness. *See* 1 L. Sand, *supra,* ¶ 3A.01 at 3A–18. *See also United States v. Oreira,* 29 F.3d 185, 188 (5th Cir.1994) ("disobey or disregard" accords with *Ratzlaf*). Further we are dealing at this point with nuances in language, and state of mind is usually based on inference rather than on direct evidence. The instruction in this case, if error at all, is neither plain nor the cause of a miscarriage of justice.

## C. *Count 67*

Hurley and Cirella were convicted of structuring while violating another federal law or as part of a pattern of illegal activity involving more than $100,000 within a 12–month period. 31 U.S.C. §§ 5322(b), 5324(3). The indictment charged that they, together with James and Kenneth Saccoccio, structured a set of six bank deposits of $8,000 to $9,000 each in several different bank accounts on October 2, 1990. The indictment said:

> [T]he defendants structured, assisted in structuring and attempted to structure and assist in structuring the transaction by dividing a quantity of currency in excess of $10,000 into two or more portions and using those smaller portions to purchase cashiers checks or other instruments in amounts under $10,000 at two or more financial institutions on the same day....

The evidence at trial showed that on October 2, 1990, Izzi told Hurley and Cirella to give him $35,000 in $10 bills and later in the day to give Kenneth Saccoccio $30,000 in $20 bills. Bank records showed that after the conversation and later that day Kenneth Saccoccio made two $9,000 transactions. The jury convicted Hurley and Cirella on count 67, and on appeal they raise a bevy of arguments.

■ The first argument is based on the fact that the trial judge, without objection, instructed the jury that structuring can occur either by dividing a sum over $10,000 into

---

**2.** Following the Supreme Court's decision in *Ratzlaf v. United States,* Congress deleted the statutory willfulness requirement for structuring offenses. 31 U.S.C. §§ 5322(a), (b), 5324(c);

Pub.L. 103–325, § 411, 108 Stat. 2160, 2253 (Sept. 23, 1994); *see* H.R.Conf.Rep. No. 652, 103d Cong., 1st Sess. 147 (1994). This recent change does not affect appellants' appeals.

deposits under that figure or by dividing the original sum into amounts that are over $10,000 but reduce the reportable amount. Appellants read the indictment language as limiting the offense to the "under $10,000" theory and argue that the "over $10,000" theory permitted the jury to convict on a different theory of the offense, impermissibly causing a constructive amendment of the indictment. *See, e.g., United States v. Atisha,* 804 F.2d 920, 927 (6th Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

The apparent strength of the argument is that the taped evidence showed these two appellants being told to assemble amounts over $10,000 and the "over $10,000" instruction appears to dovetail with this evidence. But the "over $10,000" instruction was a general one, describing one method of structuring, and had nothing in particular to do with count 67. Further, the "over $10,000" theory fit those instances (involving DeMarco, Kenneth and James Saccoccio) where a deposit occurred that was over $10,000 but less than the original sum. On the other hand, the only deposits alleged in relationship to count 67 were under $10,000.

Thus, reading the instructions in relation to evidence, we think that the jury had to understand that the government's case on count 67 amounted to this: Hurley and Cirella, to facilitate specified unreported deposits of under $10,000 on October 2, provided larger sums (as directed) in aid of and with the expectation that they would be subdivided into amounts under $10,000 to avoid reports and then deposited, as in fact they were. The practice of giving general instructions in multiple count cases, and letting the jury sort out their application according to the facts, is common and permissible.

Given this interpretation of what happened, we have no reason to consider whether there would have been a constructive amendment rather than a variance if the jury had been instructed to apply the "over $10,000" theory to count 67. *See generally* 3 C. Wright, *Federal Practice and Procedure* § 516, at 26 (2d ed. 1982) (describing distinction as "shadowy"). We do consider, but reject, appellants' claim that the evidence was inadequate to connect their delivery of $30,000 to Kenneth Saccoccio with his later deposits of amounts under $10,000 that day. The timing made the connection a permissible inference.

In a different attack, appellants argue that count 67 was facially defective because it alleged, but failed to specify, the other federal law concurrently violated or the pattern of illegal activity involving over $100,000 within 12 months. This additional allegation was not needed to prove the violation but was needed to trigger the enhanced penalty provided by section 5322(b). Appellants rely on *United States v. Hajecate,* 683 F.2d 894, 901–02 (5th Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1983), where the Fifth Circuit overturned a structuring conviction because the structuring count did not specify the other illegal act or pattern.

Here, count 67 did incorporate by cross reference the 22 introductory paragraphs of count 1 where the government described the smurfing operation in detail, identified the role of each appellant, and noted that large volumes of cash were involved. Hurley and Cirella had to know that the pattern of illegal activity alleged by the government was the vast smurfing enterprise of which count 67 was but a single example. Cross references are permissible in indictments. *United States v. Yefsky,* 994 F.2d 885, 894 (1st Cir. 1993). There is no showing that either appellant was prejudicially misled.

### D. *Counts 54–68*

Kenneth and James Saccoccio make a more promising attack on their own convictions for structuring. They say that there is insufficient evidence that they knew structuring to be illegal, as *Ratzlaf* required, and that they were thus entitled to judgments of acquittal. In *Ratzlaf* itself, the dissent contended that the majority's knowledge requirement would frustrate the statute; the majority said that reasonable inferences could be drawn. —— U.S. at —— n. 19, ——–——, 114 S.Ct. at 663 n. 19, 669–70. Our case presents just this issue.

There is no direct evidence that either appellant knew that structuring was a crime.

At the same time, the evidence permitted the jury to conclude that both knew that drug money was involved; that both knew that the break-downs of the cash were designed to disguise proceeds; and that both were paid in proportion to the deposits they made. In addition, Kenneth Saccoccio made a recorded statement indicating that he knew that his own activity was criminal; and given their common role and association a jury could reasonably infer that James had the same level of apprehension.[3]

We think that the thrust of *Ratzlaf*'s wilfulness requirement is met if persons engaged in depositing broken down amounts are generally conscious that their laundering operation is illegal, even if they do not know the precise requirements of the law. This circuit in *Aversa* was the only one to anticipate *Ratzlaf* and we are fully sympathetic with its aims. But those aims were to screen out persons who structured transactions to disguise amounts in situations where the actor might reasonably have no idea that the course of conduct was unlawful. *See Ratzlaf,* —— U.S. at ——, 114 S.Ct. at 660–61; *Aversa,* 984 F.2d at 499–500.

Here, there is ample evidence as to Kenneth, and enough as to James, to persuade us that a reasonable jury could find that both knew that their own activities were unlawful. This is not countered, as their brief suggests, by the fact that they generally gave their names and identifying information when requested by banks: couriers in their position could reasonably think that an individual deposit standing alone would not appear irregular, while remaining aware that anyone with a full knowledge of their activities would condemn them.

*Ratzlaf* dealt with an abstract jury instruction in yes or no terms; and in its wake, courts and juries must try to answer more concrete questions of how much is enough. Where a defendant's structuring is genuinely innocent of criminal intent, we think that under *Ratzlaf* a judgment of acquittal is proper no matter how unattractive the context. *Cf. Aversa,* 984 F.2d at 499–500. But

where the context is itself saturated with consciousness of illegality, we do not think that *Ratzlaf* requires the jury to ignore it in assessing the defendant's state of mind.

## IV. MISCELLANEOUS TRIAL ISSUES

### A. *Donna Saccoccia's Continuance Request*

■ After contesting extradition, Donna Saccoccia was returned by Switzerland to the United States, arriving on July 15, 1992, and was arraigned on that date. The government turned over the bulk of its discovery in late July. In September, her counsel requested a 60–day continuance, he was instead granted 30 days, and trial was set to begin on November 2.

Ten days before trial Donna Saccoccia's attorney asked for another continuance, which was denied. As a result, her team of lawyers had just over 100 days after arraignment to prepare for her trial. Pointing to the length of the government investigation, the number of charges and the quantity of evidence (over 1600 hours of surveillance tape and 10,000 pages of financial documents), Donna Saccoccia claims that the denial of the second continuance was prejudicial error.

Although the government asserts that Donna Saccoccia's counsel were able to prepare during the extradition proceedings, this is at least open to dispute. Still, many of the issues were common to all of the defendants, so that Donna Saccoccia benefited from the work of her co-defendants' counsel, who had eight months to prepare, examine the government's tapes and documents, search for exculpatory evidence and do research. Although a few issues were peculiar to Donna Saccoccia, the common issues bulked large.

Given the broad discretion enjoyed by trial judges, *see United States v. Lussier,* 929 F.2d 25, 27 (1st Cir.1991)—especially in the complex task of organizing a multi-defendant trial—we have no hesitance in upholding the district court's denial of a second continu-

---

**3.** After hearing that Hurley had encountered a police roadblock, Kenneth Saccoccio said, "Imagine if we went by yesterday," referring to a day (July 2, 1990) on which he had engaged in various structuring transactions.

ance. Her lead counsel appears to have performed ably and there is no indication of prejudice. The time allowed was generally adequate *see United States v. Waldman,* 579 F.2d 649 (1st Cir.1978), and the cases overturning convictions for lack of preparation time involve more severe circumstances. *E.g., United States v. Gallo,* 763 F.2d 1504 (6th Cir.1985) (RICO count added eleven days before trial), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986).

### B. *Carlo DeMarco's Severance Request*

■ Carlo DeMarco, an employee of Stephen Saccoccia for only about three months, was convicted of RICO conspiracy but not charged with any substantive offense. Midway through the trial he moved for a severance on the ground that Anthony DeMarco, his brother and co-defendant, would testify on his behalf in a separate trial. Carlo offered the affidavit of his counsel that Anthony would testify (along with a few less important facts) that Carlo "was not to be told anything except that he was working for a gold dealer." The district court held that the motion was untimely and without merit.

In *United States v. Drougas,* 748 F.2d 8, 19 (1st Cir.1984), we held that to show an abuse of discretion in these circumstances, a defendant must show that the proffered testimony is genuinely necessary, exculpatory, and will in fact be forthcoming in a severed trial. It is doubtful that the affidavit from counsel satisfied this requirement. *See United States v. Perkins,* 926 F.2d 1271, 1280–81 (1st Cir.1991). In all events, Fed. R.Crim.P. 12(b)(5) specifies that motions to sever must be made where feasible before trial. Defense counsel's claim that he had not previously had a chance to consult adequately with his co-defense counsel is manifestly lame.

### C. *Minimization of Electronic Surveillance*

Cirella, Hurley and Anthony DeMarco moved at trial to suppress the government's recordings made by telephone taps and listening devices installed in Trend and Saccoccia Coin. They charged the government failed to comply with 18 U.S.C. § 2518(5),

which requires that surveillance shall be conducted "in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter...." We uphold the trial judge's denial of the suppression motion without reaching the question of whether the remedy for a violation would be suppression. *See Scott v. United States,* 436 U.S. 128, 135–36 n. 10, 98 S.Ct. 1717, 1722 n. 10, 56 L.Ed.2d 168 (1978) (raising but not deciding the issue).

■ *Scott* made clear that the statute does not forbid interception of non-pertinent conversations but requires a reasonable effort to minimize such interceptions. 436 U.S. at 137–40, 98 S.Ct. at 1723–24. Here, the government described the agents' directives to turn off monitoring equipment for irrelevant conversations; it supplied statistics showing that about three-quarters of the time that the agents turned off the monitoring device, they did so because the conversation was deemed non-pertinent; and it pointed to regular reports made to the district court, and to ongoing contacts between the agents and the prosecutors sometimes involving guidance on monitoring. *See United States v. Angiulo,* 847 F.2d 956, 979 (1st Cir.), *cert. denied,* 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988).

The Saccoccia enterprise was a widespread and complicated operation in which the illegal conduct was deliberately disguised by the company's legitimate activities. The conspirators employed code phrases that mimicked industry terminology and used code names for each other, banks and clients. Many of the participants were related by blood or marriage, and incriminating exchanges were often interspersed with personal conversation. It is hard to see how the agents could have done more than make a good-faith determination to turn off recording devices when a conversation was seemingly unrelated to the laundering operation.

Here, as in *United States v. Uribe,* 890 F.2d 554, 558 (1st Cir.1989), "[d]efendants [have] offered no evidence tending to show, or even to suggest, a pattern of listening to calls after it became clear that the calls were innocuous." A so-called survey conducted by

the son of Hurley's lawyer purported to show that a substantial number of non-pertinent conversations were recorded; but the survey was flawed by his subjective criteria of pertinence (for example, the son classified conversation regarding gold as non-pertinent even though the Saccoccia employees regularly employed gold industry words as code phrases for money laundering transactions). The district court properly disregarded the study.

### D. Count 143

■ Count 143 charged Hurley with a Travel Act violation for transporting $248,000 on a specified date from New York to Rhode Island, to promote specified unlawful activity, namely, structuring and money laundering. Hurley admits that the indictment charged the first two requisites—interstate travel and intent to promote an unlawful activity. 18 U.S.C. § 1952. But, he says, there is no allegation that (in the statutory phrase) he "thereafter" performed or attempted an act to further the unlawful activity. *Id.*

This is a legitimate argument. But we think that the quoted statutory phrase must be read in light of its apparent purpose: to screen out interstate travel by a racketeer who, however malign his purpose, ultimately does nothing to advance the illegal activity. Here, Hurley's transportation of the money from New York to Rhode Island was a central part of the ongoing laundering operation. The particular trip was not only interstate travel but also comprised—"thereafter"—the *delivery* of funds for laundering. *Accord United States v. Brown,* 770 F.2d 768, 772 (9th Cir.) (importation of heroin), *cert. denied,* 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985).

Given our reading of the "thereafter" language, there is thus no need to consider whether (as claimed by the government) the general descriptions of Hurley's activities (incorporated in count 143 by reference to count 1) could independently supply a subsequent act. We also think it unnecessary to discuss Hurley's argument that the evidence was insufficient to show that he participated in the particular trip which unquestionably occurred. While Hurley's involvement depended on inferences from different pieces of

evidence, the jury was entitled to draw those inferences.

### E. Donna Saccoccia's Mental Competence

■ At Donna Saccoccia's rearraignment on July 23, 1992, her trial counsel made and then abandoned a suggestion that she be examined professionally in relation to her current mental condition. The trial proceeded with no further request for such an examination or suggestion of incompetency, until—about six months after the trial—the presentence report alluded to a possible sentence reduction for diminished mental capacity. The defense then retained a clinical psychologist who examined Donna Saccoccia and concluded that she was mentally incompetent and had been throughout the trial.

Two days before sentencing, trial counsel filed a motion seeking a competency hearing, which is required where there is "reasonable cause" to believe that a defendant is "mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). In a two-day preliminary proceeding, the psychologist testified that Donna Saccoccia was able to understand the proceedings but opined that she did not have the ability to assist counsel because of depression, anxiety and passivity. The district court found that a full-scale competency hearing was not required and Donna Saccoccia now appeals that decision.

This is a close issue. The fact that a reputable expert gives his opinion does not resolve the matter, even if there is no countervailing expert evidence on the other side. *See Figueroa–Vazquez v. United States,* 718 F.2d 511, 512 (1st Cir.1983). But here the expert appears to have made a substantial examination and his concerns—although not his specific conclusions—have a degree of support in trial counsel's comment at the arraignment and the concerns expressed in the presentence report. For obvious reasons, competency claims are not subject to ordinary waiver doctrine. *Pate v. Robinson,* 383 U.S. 375, 384, 86 S.Ct. 836, 841, 15 L.Ed.2d 815 (1966).

On the other hand, the focus of the incompetency claim in this case is upon Donna Saccoccia's ability or inability to assist in her defense. The trial judge had some basis for doubting whether the psychologist understood the issues in the case well enough to make a judgment, but far more important is the silence of defense counsel on this point during the trial. An experienced trial lawyer ought to be the first to notice a lack of cooperation or ability to assist so severe as to raise competency questions. There was no complaint from trial counsel until after trial when the presentence report reawakened counsel's interest in the matter.

Neither at the preliminary competency hearing nor on appeal has counsel been able to point to any specific problems with Donna Saccoccia's assistance during trial. This is not a conclusive objection since (in theory) the impairment might prevent counsel from ever learning of information helpful to the defense; but the generalized character of the claim weakens its force. The district judge, who presided over the trial and the preliminary hearing, is entitled to some latitude in making judgment on the need for a full-scale competency hearing. *United States v. Garrett,* 903 F.2d 1105, 1116 (7th Cir.), *cert. denied,* 498 U.S. 905, 111 S.Ct. 272, 112 L.Ed.2d 227 (1990). Having reviewed the transcript of that hearing, we sustain the district court's ruling.

## V. SENTENCING ISSUES

### A. *Ex Post Facto Claim*

■ Under the RICO sentencing guidelines, the district judge properly employed the money laundering guideline in sentencing appellants on the RICO conspiracy count. U.S.S.G. § 2E1.1. The money laundering guideline in effect at the time of sentencing increased a defendant's base offense level for money laundering by three levels if the defendant "knew or believed" that the laundered money was the proceeds of narcotics sales. *Id.* § 2S1.1(b)(1). That provision became effective on November 1, 1991; previously, the increase applied only if the defendant "knew" that the money came from narcotics.

In a claim not raised at sentencing, appellants now argue that the district court erred by applying the new and broader guideline, because (they say) the last actual money laundering offense occurred in April 1991 before the new guideline took effect. *See United States v. Cousens,* 942 F.2d 800, 801 n. 1 (1st Cir.1991). The government responds that the RICO conspiracy itself continued at least until November 1991, asserting that no *ex post facto* problem exists where the crime continues after the effective date of a new guideline sentence. *E.g., United States v. David,* 940 F.2d 722, 739 (1st Cir.), *cert. denied,* 502 U.S. 989, 112 S.Ct. 605, 116 L.Ed.2d 628 (1991). *David* can arguably be distinguished, but the issue need not be decided here.

The new guideline language was intended to apply the enhancement to cases in which a defendant "knew" that drug trafficking was involved, but the knowledge turned out to be mistaken because (for example) the operation was a government sting and no real narcotics were involved. *See* U.S.S.G. app. C, amend. 378 (1994). Here, the money was in fact the proceeds of narcotics trafficking so belief and knowledge were the same thing. A defendant who merely believed the drug proceeds were involved would (because of the correctness of that belief) also know that drug proceeds were involved.

Appellants contend that the district court misinterpreted the phrase "knew or believed" to allow an increase based on a showing that appellants merely suspected or should have known that drug money was involved. We have examined the transcript of the sentencing and reject this conjecture. In some cases, an appellant was shown to have direct knowledge, and in others, knowledge was inferred from circumstances; but in each case a fair reading of the trial court's remarks show that the judge determined that the appellant knew the source of the laundered funds.

Pizzo and James Saccoccio assert that even if the court did not misunderstand the standard, the evidence was inadequate to show that they knew that the laundered money was the proceeds of narcotic sales. As explained earlier in the opinion, the evidence on

this point was sufficient. Even apart from Pizzo's disputed reference to "the coke," the volume of funds, the duration, the geographic source, the use of small bills and other circumstances made it entirely reasonable to infer that direct participants in the enterprise knew that the funds were derived from drugs.

### B. *Other Sentencing Errors*

The offense level for money laundering offenses is keyed to the value of the laundered funds. U.S.S.G. § 2S1.1(b)(2). Appellants contend that in various respects the sentencing court erred in determining the value of the funds and in determining the varying amounts that it found each individual appellant reasonably had foreseen. U.S.S.G. § 1B1.3(a)(1)(B). These are largely factual issues, reviewable only for clear error. *United States v. LaCroix*, 28 F.3d 223, 231 (1st Cir.1994). We have examined each of these claims of error and think that the district court's findings are supportable, and that none involves any issue of law requiring discussion.

 Something closer to an issue of law is presented by the district court's determination that Carlo DeMarco was entitled to a two-level reduction as a minor participant rather than to the four-level decrease as a minimal participant. *See* U.S.S.G. § 3B1.2. The issue arises because DeMarco participated for only a few months in the RICO conspiracy and was held responsible for only $3.9 million of the $136 million conspiracy. But as to that segment of the conspiracy, the court found that the range of DeMarco's activities made him a minor rather than a minimal participant.

On appeal DeMarco argues that he was entitled to have his role determined in light of the entire conspiracy. The government argues that his role should be measured only against the foreseeable conduct for which he has been held responsible. No case law discussing this issue has been cited. But we

think that common sense permitted the district judge to determine that DeMarco—who participated quite actively in several roles over a significant period and was involved with a substantial amount of laundered funds—was a minor and not a minimal participant.

## VI. FORFEITURE ISSUES

Between January 1990 and April 1991, Stephen and Donna Saccoccia wired $136,344,-231.86 to foreign bank accounts apparently controlled by Colombian drug suppliers. In the indictment, the government took the position that each appellant was jointly and severally liable for this amount under one of RICO's several forfeiture provisions, 18 U.S.C. § 1963(a)(3). This subsection requires a defendant to forfeit "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity...." *Id.* By special verdict, the jury imposed such a forfeiture in this amount on Hurley, the other appellants having waived a jury trial on forfeiture issues.[4]

The district court imposed separate forfeitures on the other appellants. *United States v. Saccoccia*, 823 F.Supp. 994 (D.R.I.1993). The court held that proceeds under section 1963(a)(3) included laundered funds obtained by an appellant even though later passed along to the Colombians, and that each appellant was responsible for funds foreseeably obtained by other co-conspirators. The court found that Hurley, Stephen and Donna Saccoccia, and Anthony DeMarco were aware of most or all aspects of the conspiracy and liable for the full amount; that the Saccoccio brothers, Cirella and Pizzo were aware mainly of the Rhode Island operation and therefore liable only for the $37,456,100.79 laundered through Trend and Saccoccia Coin; and that Carlo DeMarco, active only from August through November 1991, was responsible for $3,927,357.55 that he had deposited or otherwise known about.

---

4. The jury also imposed a separate forfeiture on Hurley of $52,800 under the money laundering provision, 18 U.S.C. § 982, in connection with a reporting violation. Neither this nor other section 982 forfeitures imposed on three other appellants by the district judge have been challenged on appeal except on grounds identical to those discussed below in connection with the RICO forfeitures.

After appellants filed notices of appeal, the government filed a motion seeking forfeiture of substitute assets, 18 U.S.C. §§ 982(b), 1963(m); following various proceedings, the district court ultimately determined that because the $136 million had been transferred out of the jurisdiction, each appellant was liable to pay the amounts in question out of any other assets of that appellant. Both the original forfeiture orders and their extension to substitute assets are the subject of a number of attacks in this case.

### A. "Proceeds ... Obtained"

The opening question is whether the $136 million wired to the Colombians constituted, at least as to the appellants who handled or controlled these funds before they were wired, "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity ... in violation of section 1962." 18 U.S.C. § 1963(a)(3). Appellants argue that "proceeds" means net profits, see *United States v. Masters*, 924 F.2d 1362, 1369–70 (7th Cir.) (semble), *cert. denied*, 500 U.S. 919, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991), in which case $136 million vastly overstates the 5 to 15 percent commission apparently retained by the Saccoccias and the (presumably smaller) amounts passed along to other appellants. Alternatively, appellants contend that none of the $137 million could fairly be regarded as "obtained" by them since it represents amounts transmitted by the Saccoccias to the drug owners themselves.

Section 1963(a)(3) was added by Congress to other RICO forfeiture provisions in 1984, and its legislative history explains without qualification that "the term 'proceeds' has been used in lieu of the term 'profits' in order to alleviate the unreasonable burden on the government of proving net profits." S.Rep. No. 225, 98th Cong., 2d Sess. 199 (1984). In *Russello v. United States*, 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983), the Supreme Court made clear its desire for generous construction of the RICO forfeiture provisions, in line with Congress' unusual command that RICO (although a criminal statute) be broadly interpreted. *See id.* at 27, 104 S.Ct. at 302–03. Given the legislative history and *Russello*, the broader definition of "proceeds" seems to us a rather easy call.

The point is borne out by imagining that Stephen Saccoccia had been caught with the $136 million in cash or gold just before delivering it to the Colombians. The cash or gold could surely be described as property representing "proceeds" which Stephen Saccoccia had "obtained" from racketeering activity in violation of section 1962, namely, through money laundering. As a matter of policy, there is every reason why the booty in that situation ought to be forfeit, and that Congress would desire such a result. *See United States v. Lizza Indus., Inc.*, 775 F.2d 492, 497–99 (2d Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986).

The more difficult question is whether property should be regarded as "obtained" by the money launderer when it has merely been held in custody by that individual and has been passed along to its true owner. To read "obtained" to cover property once held by a defendant on behalf of another has the effect—when combined with the substitute assets provision—of converting the forfeiture into a fine. Thus, at first, the temptation is to read the word "obtained" narrowly, having in mind the low level courier who merely transports the money and could face death if any of the funds were diverted.

Yet, on reflection, it is only in degree that the courier who gets a very small cut differs from intermediaries who get a larger one, and from the leader of the drug ring who is effectively paying much of the money back to suppliers and servitors of various kinds. Looking at criminal forfeiture under RICO as a kind of shadow fine, the size of the amount transported is some measure of the potential harm from the transaction. And since temporary custody is certainly enough for a possession charge in a drug case, *see United States v. Zavala Maldonado*, 23 F.3d 4, 6–8 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 451, 130 L.Ed.2d 360 (1994), it is hard to see why "obtained" should be read more narrowly.

Finally, it is very hard to escape the implications of 18 U.S.C. § 982(b)(2). There, Congress has expressly carved out a narrow

safe harbor, which protects against forfeiture a defendant who "acted merely as an intermediary who handled but did not retain the property" unless the defendant conducted three or more separate transactions involving a total of $100,000 or more in a twelve-month period. This provision indicates that Congress itself thought that a separate statute was necessary for a "passing on" defense. There is no counterpart safe harbor provision in RICO nor, in view of the amounts involved, could such a provision help any appellants in this case.

## B. *Vicarious Liability*

■ The question remains whether a defendant's forfeiture is limited to the laundered funds that the defendant himself obtained or whether it extends to funds obtained by other members of the conspiracy. The district court took the latter position with one important qualification: laundered funds obtained by other members of the conspiracy would be attributed only to the extent that they were reasonably foreseeable to the particular defendant. *Saccoccia,* 823 F.Supp. at 1004. This is a sensible resolution of a very close issue, and we follow the district court's lead.

The arguments for limiting forfeiture solely to funds personally obtained by an individual defendant are several. The statutory language speaks of a violator forfeiting "proceeds which *the person* obtained" by violating section 1962. 18 U.S.C. § 1963(a)(3) (emphasis added). In addition, the plight of a defendant who was merely a temporary custodian of cash and passed it on is even starker than that of a person who never possessed the cash at all. Thus, there is a respectable basis for holding that vicarious liability for co-conspirator behavior does not exist under section 1963.

The arguments pointing the other way seem to us stronger. Under established case law, members of a conspiracy are substantively liable for the foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Using the same concept, the Sentencing Guidelines attribute to a defendant at sentencing the fore-

seeable conduct of co-conspirators. U.S.S.G. § 1B1.3(a)(1)(B). It would be odd, although not impossible, to depart from this principle of attributed conduct when it comes to apply the forfeiture rules, which have aspects both of substantive liability and of penalty.

It is largely fortuitous whether an individual co-conspirator happened to possess the laundered funds at a particular point. If conclusive weight were given to who physically handled the money, a low-level courier or money counter could be liable for vast sums, while other higher level conspirators could easily escape responsibility. So long as the amount handled by others is foreseeable as to a defendant, the foreseeable amount represents the sounder measure of liability.

Finally, we have to give some weight to the fact that each court of appeals that has addressed the topic has concluded that the forfeiture provisions involve joint and several liability. *E.g., Masters,* 924 F.2d at 1369–70; *Fleischhauer v. Feltner,* 879 F.2d 1290, 1301 (6th Cir.1989), *cert. denied,* 493 U.S. 1074, 110 S.Ct. 1122, 107 L.Ed.2d 1029 (1990); *United States v. Benevento,* 836 F.2d 129, 130 (2d Cir.1988); *United States v. Caporale,* 806 F.2d 1487, 1506–09 (11th Cir.1986), *cert. denied,* 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). This is a somewhat backward way of putting the matter, since "joint and several" roughly describes the result without explaining the underlying theory of liability. Here, we think the theory is the familiar rule that a member of a conspiracy is responsible for the foreseeable acts of other members of the conspiracy taken in furtherance of the conspiracy. *Pinkerton,* 328 U.S. at 646–47, 66 S.Ct. at 1183–84; U.S.S.G. § 1B1.3(a)(1)(B).

Appellants appear to think that their vicarious liability for amounts they did not physically touch rests on the assumption that the Colombian drug lords who ultimately "obtained" $136 million were members of the same conspiracy. On this premise, appellants advance a number of arguments as to why such a conspiracy cannot be made out under the indictment or evidence in this case. The short answer is that the premise is mistaken; individual appellants are liable because their convicted American co-conspira-

tors obtained the funds, regardless of the status assigned to the Colombians.

Nor do we see any basis for the claim that the forfeiture violates the "excessive fines" clause of the Eighth Amendment. Although the provision is applicable to forfeitures, *see Alexander v. United States,* —— U.S. ——, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993), holding a defendant liable for an amount of money foreseeably laundered by himself and his own co-conspirators is quite rational based on a proportionality analysis. *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). In this case none of the appellants was separately fined, so we can leave for another day forfeitures imposed on top of separate fines.

We appreciate the fact that a formidable penalty can be inflicted when one disallows a passing-on defense then imposes vicarious liability for the foreseeable acts of co-conspirators. The government can collect its $136 million only once but, subject to that cap, it can collect from any appellant so much of that amount as was foreseeable to that appellant. But there is no reason to think that this result is unattractive to Congress, which requested a broad construction of RICO, or to the Supreme Court, which followed this policy in *Russello.*

### C. Substituted Assets

The indictment in this case sought forfeitures against each of the appellants of approximately $140 million and expressly invoked 18 U.S.C. § 1963(m). Section 1963(m) provides that if property subject to forfeit cannot be found or has been transferred then "the court shall order the forfeiture of any other property of the defendant up to the value of" the property subject to forfeit. *See also* 18 U.S.C. § 982(b) (similar provision in money laundering statute incorporated from 21 U.S.C. § 853(p)). In this case, the original jury verdicts contain a determination of forfeiture only as to Hurley; forfeiture findings against the other appellants were made thereafter by the district court, as earlier described.

Appellants filed notices of appeal from their convictions in May and June 1993. On July 16, 1993, the government moved in the district court to amend the forfeiture provisions of its judgments to substitute other property of the appellants for the $137 million in laundered funds. After a hearing, the court granted these motions. On appeal, appellants argue that the district court lacked jurisdiction to enter those orders because appeals had already been taken.

■ This claim rests on the "general rule" that "entry of a notice of appeal divests the district court of jurisdiction to adjudicate any matters related to the appeal." *United States v. Distasio,* 820 F.2d 20, 23 (1st Cir. 1987). But the rule is not absolute, for even after the appeal is filed the district court retains authority to decide matters not inconsistent with the pendency of the appeal. *See Spound v. Mohasco Indus., Inc.,* 534 F.2d 404, 411 (1st Cir.) *cert. denied,* 429 U.S. 886, 97 S.Ct. 238, 50 L.Ed.2d 167 (1976). A district court may, for example, determine attorneys' fees after an appeal has been taken or act in aid of execution of a judgment that has been appealed but not stayed. *See In re Nineteen Appeals,* 982 F.2d 603, 609 n. 10 (1st Cir.1992); *International Paper Co. v. Whitson,* 595 F.2d 559, 561–62 (10th Cir. 1979). We think that the substitution of assets orders fit within this general category.

■ Criminal forfeiture orders are something of a mongrel. The initial forfeiture is sought in the indictment and, absent a waiver of jury trial, is specified in the jury verdict. *See* Fed.R.Crim.P. 7(c)(2); 31(e). But the statute says that an order substituting assets is to be made by "the court." 18 U.S.C. § 1963(m). The implication is that such an order may commonly be entered after the initial forfeiture has been determined. Indeed, the government might not even know that substitution is necessary until it seeks to take possession of the property specified in the initial forfeiture order.

Under these circumstances, we see no reason why the taking of the appeal should divest the district court of authority to enter an order forfeiting substitute property. Appellants do not provide any reason to think that this would interfere with, or contradict, the court of appeals' consideration of the original judgment of a conviction and sen-

tence, including the initial forfeiture order. Avoiding such interference and inconsistency is the purpose of the general rule barring district court proceedings during the pendency of an appeal. *Venen v. Sweet,* 758 F.2d 117, 121 (3d Cir.1985). There is no reason to extend this ban further than its own rationale.

Of course, the substitute assets order, if one is eventually made, may give rise to *new* issues for appeal, but a new appeal can be taken directly from this order. Similarly, a decision of the appeals court on the original conviction could undermine the substitute assets order (*e.g.,* by overturning the conviction itself or the initial forfeiture), but a substitute assets order can then be undone or overturned. After all, determination of counsel fees in a section 1983 case presents the same problem and is resolved in precisely this manner. *See, e.g., Casa Marie Hogar Geriatrico, Inc. v. Rivera–Santos,* 38 F.3d 615 (1st Cir.1994) (separate appeal of counsel fees subsequent to original judgment on the merits).

■■■ Appellants' other attack on the substitute assets orders is that those orders countervail the double jeopardy clause, U.S. Const. amend. V, and principles of fundamental fairness. Appellants' basic argument is that the original RICO forfeiture orders were limited to forfeitures of the laundered monies and that the orders extending forfeiture to substitute assets constituted either a second prosecution for the same offense or multiple punishments for that offense. *See North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076–77, 23 L.Ed.2d 656 (1969); *see also Witte v. United States,* —— U.S. ——, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995).

We found no case law directly in point but see no reason in principle why the substitute assets provision should be regarded either as a second prosecution or as a forbidden multiple punishment. The fact that the substitute assets order may be entered at some time after the original conviction does not make it a second prosecution, any more than sentencing after conviction is a second prosecution. The substitution order is entered in the original proceeding as one of a number of steps,

primarily relating to post-conviction sanctions, that are known to the defendant from the outset.

As for the claim of multiple punishment, the Constitution does not prevent multiple sanctions for one offense where the sanctions are specified in advance by Congress and imposed in reasonable proximity to the conviction: a fine *and* imprisonment is a common federal sentence. The situations in which later increased penalties have been condemned as multiple punishments are quite remote from this case and involve aggravating elements that are not even arguably present here. *Arizona v. Rumsey,* 467 U.S. 203, 209–12, 104 S.Ct. 2305, 2309, 81 L.Ed.2d 164 (1984) (death sentence); *Pearce,* 395 U.S. at 723–26, 89 S.Ct. at 2079–81 (penalty for appeal).

## VII. CONCLUSION

A number of the remaining arguments made by appellants have been addressed by the court in the decision affirming Stephen Saccoccia's conviction and need not be discussed again. These include attacks on certain references to the Colombians, on the admission of dog sniff evidence, on testimony by Agent Shedd, and on tape excerpts claimed to refer to cocaine and drug money. Similarly, Donna Saccoccia's claims relating to extradition, to the extent not waived, are in substance covered by the earlier opinion's discussion of Stephen Saccoccia's counterpart claims. Several additional arguments (*e.g.,* Kenneth Saccoccio's "theory of the defense" instruction) have been considered but deemed not to require separate treatment.

The charges in this case involved a web of multi-paragraph statutes with intricate provisions that the jury had to apply to numerous transactions involving multiple defendants and occurring over a considerable period of time. In these circumstances, we have reviewed appellants' claims not only as individually presented, but also with an eye to making certain that no innocent person has been wrongly enmeshed in criminal proceedings. We are satisfied that while several debatable issues have been raised on appeal,

there was no prejudicial error and that the verdict returned by the jury was a just one.

*Affirmed.*