# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 97-4025WM, 98-1070WM

_____

United States of America,

       Appellee,

  v.

Cathryn M. Simmons,

       Appellant.

_____

No. 97-4027WM

_____

United States of America,

       Appellee,

  v.

Michael L. Fisher,

       Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\* On Appeals from the United States
\* District Court for the
\* Western District of Missouri
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

## ORDER

Counsel for the United States has drawn our attention to a factual mistake in this opinion. The opinion states that Mr. Griffin was acquitted of the RICO count, whereas in fact the jury was unable to reach agreement on that count.

Accordingly, the opinion is amended to correct this error, and the Clerk is directed to file an amended opinion containing the appropriate change.

This change does not affect the merits or the legal analysis, and the filing of the amended opinion does not supersede the running of the time period within which to petition for rehearing.

September 8, 1998

Order Entered at the Direction of the Court.

Clerk, U.S. Court of Appeals, Eighth Circuit.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

### Nos. 97-4025WM, 97-4027WM, 98-1070WM
_____

_____        *

Nos. 97-4025WM, 98-1070WM     *

_____        *

United States of America,     *

        Appellee,     *   On Appeal from the United
                            *   States District Court
                            *   for the Western District
        v.     *   of Missouri.

Cathryn M. Simmons,     *

        Appellant.     *

_____

### No. 97-4027WM
_____

United States of America,     *

        Appellee,     *   On Appeal from the United
                            *   States District Court
                            *   for the Western District
        v.     *   of Missouri.

Michael L. Fisher,     *

        Appellant.     *

_____

Submitted: June 9, 1998

Filed: August 17, 1998

Amended: September 8, 1998

_____

Before RICHARD S. ARNOLD and MORRIS SHEPPARD ARNOLD, Circuit
Judges, and PANNER,[1] District Judge.

_____

RICHARD S. ARNOLD, Circuit Judge.

A jury convicted Cathryn M. Simmons of twelve bribery violations under 18
U.S.C. § 666(a)(2) (1994), five mail-fraud violations under 18 U.S.C. § 1341 (1994),
and one violation of the Racketeer Influenced and Corrupt Organizations Act (RICO),
18 U.S.C. § 1962 (1994). The same jury convicted Michael L. Fisher of two bribery
violations, one mail-fraud violation, and one RICO violation. Simmons and Fisher now
appeal the District Court's[2] resolution of forfeiture issues, and Simmons also appeals
sentencing issues.

I.

On October 31, 1996, a grand jury returned a twenty-six-count indictment

_____

[1]The Honorable Owen M. Panner, United States District Judge for the District
of Oregon, sitting by designation.

[2]The Honorable Dean Whipple, United States District Judge for the Western
District of Missouri.

against Bob F. Griffin, Cathryn M. Simmons, Michael L. Fisher, and Steven R. Hurst. At the time, Griffin served as Speaker of the Missouri House of Representatives; Simmons owned and operated several political consulting firms; Fisher was the President of the Greater Kansas City AFL-CIO; and Hurst was a registered lobbyist. App. at 10-11. Count One of the indictment charged that the four defendants and Richard E. Moore, who was a member of the Clay County Commission in Clay County, Missouri, and was not a defendant in this case, were associated with a RICO enterprise, through which Griffin and Moore, in return for bribe payments, obtained consulting contracts for Simmons. App. 11-12. In addition to the RICO violation, the indictment alleged 25 violations of federal bribery and mail-fraud statutes. App. 39-52. The indictment also sought forfeiture of assets from the defendants pursuant to the RICO Act. App. 36-38.

The indictment set forth the racketeering and other charges in the context of five different "schemes." The first scheme involved the Motor Fuel Tax Bill, which was introduced in the Missouri House of Representatives on January 9, 1992, and which was proposed to increase the state motor fuel tax by six cents a gallon over five years to pay for construction of highways, roads, and bridges in Missouri. Proponents of this legislation included the Heavy Constructors Association of Kansas City and the Associated General Contractors of Missouri, two organizations representing construction companies in Missouri. The indictment alleged that shortly after the introduction of the Motor Fuel Tax Bill, Griffin met with members of the Heavy Constructors Association, the Associated General Contractors, and other construction groups in a hotel in Jefferson City, and recommended that members of the construction industry hire Simmons to assist them in lobbying for the new motor fuel tax. The Heavy Constructors Association and the Associated General Contractors hired Simmons to lobby for the Motor Fuel Tax Bill -- which eventually passed the Missouri House of Representatives -- and paid her a total of $264,000 for her efforts. According to the indictment, in February 1994, after the passage of the fuel tax, Simmons gave Griffin two checks for $5,000 each. App. 13-15.

The second scheme alleged in the indictment involved Health Midwest, Inc., a Kansas City corporation which owned and operated hospitals in Missouri and Kansas, and which sought to purchase North Kansas City Hospital, which was owned by the City of North Kansas City, Missouri. To facilitate this sale, Health Midwest hired Richard E. Moore and his public-relations firm, Moore, Sturges and Associates. Moore in turn hired Simmons to aid in the purchase of the hospital, and agreed to pay Simmons $9,200 per month for her services. Around this time, Simmons also entered into a contract with City Management Corporation, a corporation that operated landfills in Missouri, under which Simmons would assist City Management Corporation in establishing a landfill in Clay County, Missouri. According to the indictment, Simmons agreed to forego the $9,200 monthly payment for her work on the hospital purchase in exchange for Moore's using his position as a Clay County Commissioner to influence the Clay County Commission to approve the establishment of the new landfill. App. 21-23.

The third scheme alleged in the indictment involved the Certificate of Need (CON) Committee, a committee established by Missouri statute to determine the need for health care facilities at different locations in the state. The members of the CON Committee are appointed by the Governor of Missouri, the President Pro Tem. of the Missouri Senate, and the Speaker of Missouri's House of Representatives. According to the indictment, officials with Health Midwest, Inc., believed that Missouri State Representative Bill Skaggs, a member of the CON Committee appointed by Griffin, was hostile to some of their activities. In August 1992, Griffin, Simmons, Fisher, Hurst, and Moore met and discussed the possibility of Griffin's removing Rep. Skaggs from the committee. In January 1993, Griffin removed Rep. Skaggs from the CON Committee, allegedly in exchange for a $10,000 check paid to him by Simmons. App. 25-26.

The fourth scheme alleged in the indictment involved a special session of the Missouri legislature called in September 1993, in the wake of heavy flooding that

summer, to consider legislation authorizing the Missouri State Highway and Transportation Commission to issue revenue bonds for the construction and repair of highways, roads, and bridges. Griffin suggested to representatives of the Heavy Constructors Association and other members of the construction industry that they hire Simmons as a consultant to work on the proposed revenue bond legislation, and the construction industry representatives followed Griffin's suggestion. The indictment alleged that in exchange for Griffin's recommendation, Simmons, through Hurst, paid Griffin's son, Jeff Griffin, $5,000 to lobby on behalf of the revenue bond bill. App. 28-30.

The final scheme alleged in the indictment involved a Health Care Reform Bill considered by the Missouri legislature in late 1993 and early 1994. The indictment alleged that in January 1994, executives at Blue Cross Blue Shield of Kansas City, a health insurance company, met with Simmons and Fisher and entered into an agreement under which Simmons and Fisher, through Simmons's public relations firms, would assist them in defeating or substantially amending any health care reform legislation being considered by the legislature. In February 1994, Griffin met with Blue Cross Blue Shield officials at Simmons's home in Jefferson City to discuss the health care legislation. And in late January and early March, Simmons and Fisher allegedly paid Griffin a total of $41,000 for his help in advising Blue Cross Blue Shield executives about the pending Health Care Reform Bill. App. 31-33.

After several weeks of trial in May and June 1997, a jury convicted Cathryn Simmons of 18 of the 20 counts against her, including the RICO count. Simmons was acquitted of the bribery count involving the removal of Rep. Bill Skaggs from the CON Committee and the bribery count involving the payment of money to Jeff Griffin for his work on the highway bond bill. Michael Fisher was convicted of four of the five counts against him, including the RICO count, and was acquitted of the bribery count involving the removal of Rep. Skaggs from the CON Committee. Bob Griffin was acquitted of three of the counts against him, and the jury was unable to reach a decision

on the other six counts, including the RICO count. Steven Hurst was acquitted of all three counts brought against him.

For purposes of the federal Sentencing Guidelines, Simmons's offense level was determined to be 29, Criminal History Category I, which has a range of 87 to 108 months' imprisonment. Fisher's offense level was 26, Criminal History Category I, which has a range of 63 to 78 months' imprisonment. However, because Simmons and Fisher both agreed to testify against Griffin at Griffin's retrial, they each received downward departures below the applicable Sentencing Guidelines pursuant to U.S.S.G. § 5K1.1 (1997). Simmons's sentence was reduced to 50 months' imprisonment, with three years of supervised release and a $900 special assessment. Fisher's sentence was reduced to 39 months' imprisonment, with three years of supervised release, a $5,000 fine, and a $200 special assessment. The government also sought forfeiture of $366,000 obtained by Simmons and Fisher in violation of RICO, including $264,000 paid to one of Simmons's consulting firms for a consulting contract related to the 1992 Motor Fuel Tax Bill, and $102,000 paid to two of Simmons's other firms for consulting contracts related to the 1994 Health Care Reform Bill. Simmons and Fisher agreed to waive their right to submit any forfeiture issues to the jury and to allow the District Court to decide these issues. In an order filed October 23, 1997, the District Court granted the government's motion and ordered forfeiture of $366,000 jointly and severally by Simmons and Fisher.

On appeal, Simmons argues the District Court erred when, for purposes of the Sentencing Guidelines, it found that she was a leader or organizer of a criminal enterprise. Fisher and Simmons also challenge the District Court's rulings with respect to the forfeiture issues in this case.

II.

When the District Court calculated Cathryn Simmons's offense level, she

received a four-level increase to her sentence for being "an organizer or leader of a criminal activity" involving five or more participants or which was otherwise extensive. U.S.S.G. § 3B1.1(a) (1997).[3] In determining whether to enhance a defendant's sentence under U.S.S.G. § 3B1.1, the sentencing court should consider such factors as "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, comment 4. This Court has interpreted "organizer or leader of criminal activity" broadly. United States v. Manuel, 912 F.2d 204, 207 (8th Cir. 1990). We review a sentencing court's findings under § 3B1.1, like other findings of fact, for clear error. United States v. Peters, 59 F.3d 732, 734 (8th Cir. 1995). Simmons argues not only that a four-level increase was unjustified, but also that she is entitled to a downward departure because her role in the RICO enterprise was minimal.

The District Court's ruling that Simmons was a leader or organizer of criminal activity, and therefore subject to the four-level increase, was not clearly erroneous. Testimony at Simmons's trial showed that she was heavily involved with organizing the schemes alleged in the indictment. Rick Moore testified that Simmons attended several meetings in the summer of 1992 with Hurst, Moore, and Fisher to discuss the purchase of the North Kansas City Hospital by Health Midwest, Inc., and that she organized at least one of these meetings. Trial Tr. at 720-23. John W. Walker and Larry Chastain, executives with Blue Cross Blue Shield of Kansas City, testified that Simmons organized a meeting at her town house in Jefferson City between Hurst, Fisher, Bob

---

[3]Simmons argues that the sentencing issues must be remanded because the District Court relied on objected-to portions of the Presentence Report with regard to sentencing. Simmons Br. at 5. We disagree. The district judge made clear to Simmons that he was relying on factual information from the Presentence Report and evidence presented at trial, and Simmons did not object. Sentencing Tr. at 9-10.

Griffin, herself, and Blue Cross Blue Shield officials to discuss the 1994 Health Care Reform Bill, and how Simmons's public relations firm might represent Blue Cross Blue Shield in lobbying the legislature. Id. at 1529-31, 1631. And Bill Williams, the executive director of the Heavy Contractors Association, testified that Simmons presented to the Missouri Transportation Coalition a handwritten proposal that it employ her firm to work on the Motor Fuel Tax Bill in 1992. Id. at 501. Given this testimony, it was not clear error to hold that Simmons was an organizer of the bribery schemes. In affirming the District Court on this point, we also reject Simmons's argument that the District Court erred in not granting a downward departure for a minimal role in the RICO enterprise. Her role was anything but minimal.

Much of Simmons's argument that she did not deserve the four-level enhancement relies on her assertion that Bob Griffin, as an experienced politician and lawyer, was in control of the RICO enterprise and at times directed her actions. This argument ignores the Sentencing Guidelines comment that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, comment 4. Emphasis on the organizational or leadership role of Griffin in the conspiracy does not diminish the fact that, on several occasions, it was Simmons who organized the meetings between herself, Griffin, and corporations like Health Midwest and Blue Cross Blue Shield, that enabled her to procure consulting contracts and continue the bribery schemes.

III.

A.

The District Court ordered forfeiture of $366,000 from Simmons and Fisher, a sum which included $264,000 in proceeds paid by construction and transportation interests for lobbying on the 1992 Motor Fuel Tax, and $102,000 paid by Blue Cross Blue Shield for lobbying on the 1994 Health Care Reform Bill. Fisher argues that the

District Court erred when it held him liable for the $264,000 in proceeds associated with the Motor Fuel Tax scheme. While Fisher admits that the evidence at trial showed that he helped Simmons obtain the lobbying contract for the Motor Fuel Tax Bill and later assisted her with the lobbying efforts, Fisher Br. at 18, he maintains that he should not be required to forfeit the relevant proceeds because he was neither indicted for nor convicted of any of the racketeering acts related to the Motor Fuel Tax scheme.

The three individual counts on which Fisher was convicted had nothing to do with the Motor Fuel Tax scheme. He was also convicted, however, on the RICO count, which alleged that all five schemes were part of the illegal enterprise. In addition, the forfeiture portion of the indictment alleged that Fisher was responsible for the $264,000 paid to Simmons's company as part of the Motor Fuel Tax scheme. The District Court, sitting as the trier of fact by agreement of the parties on forfeiture issues, found that Fisher's complicity in the Motor Fuel Tax scheme had been established beyond a reasonable doubt. The RICO statute, alone to our knowledge among federal criminal laws, expressly states that it is to be construed broadly to effect its remedial purpose of combating organized crime. In these circumstances, we see no error in the District Court's decision to hold Fisher liable for forfeiture of the proceeds associated with the Motor Fuel Tax scheme.

Codefendants are properly held jointly and severally liable for the proceeds of a RICO enterprise. See United States v. Hurley, 63 F.3d 1, 22-23 (1st Cir. 1995), cert. denied, 517 U.S. 1105 (1996); United States v. Masters, 924 F.2d 1362 (7th Cir.), cert. denied, 500 U.S. 919 (1991); United States v. Benevento, 836 F.2d 129, 130 (2d Cir. 1988) (per curiam); United States v. Caporale, 806 F.2d 1487, 1506-09 (11th Cir. 1986), cert. denied, 482 U.S. 917 (1987). The government is not required to prove the specific portion of proceeds for which each defendant is responsible. Such a requirement would allow defendants "to mask the allocation of the proceeds to avoid forfeiting them altogether." Caporale, 806 F.2d at 1508. In addition, the District Court found that the actions of the other defendants with respect to the Motor Fuel Tax

-11-

scheme were reasonably foreseeable to Fisher. See Hurley, 63 F.3d at 22 (defendant jointly and severally liable for laundered funds obtained by other members of a RICO conspiracy to the extent that they were reasonably foreseeable to the defendant). Our ruling is in accord with the traditional rules with respect to criminal conspiracy, under which all members of a conspiracy are responsible for the foreseeable acts of co-conspirators taken in furtherance of the conspiracy. See Pinkerton v. United States, 328 U.S. 640, 646-47 (1946); Hurley, 63 F.3d at 22.

In this case, after Fisher and Simmons elected to have the District Court render the verdict on the forfeiture issue, the Court found that "funds obtained and used by Simmons in connection with her violation of the RICO statute were reasonably foreseeable to Fisher . . .." Order at 10. Indeed, Fisher recognizes in his brief that a factfinder could reasonably find that he assisted Simmons in obtaining the contract to work on the Motor Fuel Tax. Fisher Br. at 18. Given Fisher's knowledge of the funds obtained by Simmons, and his status as a member of the RICO enterprise, we hold him jointly and severally liable for the full $366,000 forfeiture.

B.

Simmons and Fisher also challenge the District Court's refusal to deduct the direct costs associated with their lobbying efforts from the amount they were required to forfeit because of their participation in the 1992 Motor Fuel Tax Bill scheme. Based on the evidence of costs offered at trial, Simmons and Fisher argue that the costs associated with their lobbying for the Motor Fuel Tax Bill, or $101,787.07, should be deducted from the amount of money Fisher and Simmons received for their work on the Motor Fuel Tax Bill, or $264,000, so that the amount they would forfeit would be $162,212.93. See Fisher Br. Add. at 1. The District Court refused to deduct any costs associated with lobbying and ordered a forfeiture of the full $264,000.

At the heart of Simmons's and Fisher's argument is a disagreement with the

District Court and the government over what is meant by the term "proceeds" for purposes of the RICO statute's forfeiture provisions. Defendants who violate the RICO Act must forfeit "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity . . .." 18 U.S.C. § 1963(a)(3) (1994). Some courts have interpreted "proceeds" as the gross revenues obtained from illegal activity. See United States v. DeFries, 129 F.3d 1293, 1313-14 (D.C. Cir. 1997); United States v. McHan, 101 F.3d 1027, 1041-42 (4th Cir. 1996), cert. denied, 117 S. Ct. 2468 (1997); United States v. Hurley, 63 F.3d 1, 21 (1st Cir. 1995), cert. denied, 517 U.S. 1105 (1996). One court has held that "proceeds" means net profits, or the money received from the illegal activity minus the costs of performing the activity. See United States v. Masters, 924 F.2d 1362, 1369-70 (7th Cir.), cert. denied, 500 U.S. 919 (1991). And one court has held that for purposes of calculating "proceeds," RICO violators may deduct the direct costs of performing illegal contracts from gross receipts, but may not deduct indirect operating expenses and taxes paid on profits. United States v. Lizza Industries, Inc., 775 F.2d 492, 498 (2d Cir. 1985), cert. denied, 475 U.S. 1082 (1986).

We think the better view is the one that defines proceeds as the gross receipts of the illegal activity. As noted above, the RICO Act calls for the forfeiture of "any proceeds which the person obtained, directly or indirectly, from racketeering activity . . .." 18 U.S.C. § 1963(a)(3). The legislative history of the 1984 amendments to RICO states that "the term 'proceeds' has been used in lieu of the term 'profits' in order to alleviate the unreasonable burden on the government of proving net profits. It should not be necessary for the prosecutor to prove what the defendant's overhead expenses were." S. Rep. No. 225, 98th Cong., 2d Sess. 199 (1984). These statements indicate that Congress meant the word "proceeds" to be read more broadly than merely "profits." See United States v. Hurley, 63 F.3d at 21. In addition, Congress has explicitly directed that RICO "shall be liberally construed to effectuate its remedial purposes." Pub. L. No. 91-452 § 904(a), 84 Stat. 947 (1970). See Russello v. United States, 464 U.S. 16, 26 (1983) (observing that the RICO statute "was intended to

provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots"). Reading the word "proceeds" broadly has the benefit of punishing, through RICO's forfeiture provisions, all convicted criminals who receive income from illegal activity, and not merely those whose criminal activity turns a profit. See United States v. McHan, 101 F.3d at 1042 ("The proper measure of criminal responsibility generally is the harm that the defendant caused, not the net gain that he realized from his conduct.").

Simmons and Fisher rely heavily on United States v. Riley, 78 F.3d 367 (8th Cir. 1996), for their interpretation of the meaning of "proceeds." We read Riley more narrowly than do the defendants. In Riley, the RICO defendants, who were accused of bribing state officials and defrauding insurance regulators, appealed a preconviction order appointing a receiver to manage their insurance and finance companies. While there was some evidence that the defendants' companies had gross receipts of $28 million from 1988 to 1992, the period in which they were accused of engaging in the illegal activity, the government could not identify what property was potentially subject to forfeiture if the defendants were convicted, and could not establish the extent of the defendants' interests in the companies which the government wanted to put in receivership. Id. at 368-69. In an attempt to save the preconviction restraint order issued by the District Court, the government alleged that it intended to forfeit "at least $28 million," or the gross receipts of the defendants' companies over the four-year period. Id. at 371. This Court characterized this argument as "absurd," noting that under RICO's forfeiture provisions, " 'proceeds' means something less than the gross receipts of a defendant's insurance business because an insurer's gross receipts would include, for example, amounts needed to pay policyholder claims." Id. The $28 million "gross receipts" referred to in Riley apparently included money obtained through legal activity (e.g., premiums paid by insureds) as well as that obtained through the defendants' allegedly illegal behavior.

From 1992 to 1994, the period during which Simmons and Fisher took part in the RICO enterprise alleged in the indictment, the gross income of their public relations firms was approximately $4.5 million. See Trial Exhibit 713. The $264,000 sought by the government in this case, however, does not include the total "gross receipts" of these public relations firms during this period. It represents only the money they were paid for lobbying on behalf of the construction industry for the Motor Fuel Tax Bill. The District Court recognized as much when it wrote, "The government clearly has not sought the forfeiture of all proceeds from these defendants[;] they have only sought the gains which were achieved through these specific wrongful acts." Order at 7. This case is distinguishable from <u>Riley</u>, where the government sought forfeiture of all income from the defendants' businesses, even that which was obtained through legal means for legitimate purposes. Therefore, because we believe that "proceeds" includes the gross receipts obtained from illegal activity, we hold that the District Court properly forfeited from Simmons and Fisher the $264,000 they obtained for their work on the 1992 Motor Fuel Tax Bill.

## C.

Finally, Fisher also argues that because he was not a shareholder or principal in the corporations used by Simmons to engage in the bribery schemes, he should be responsible only for the wages he received from the corporations related to the 1992 Motor Fuel Tax Bill and the 1994 Health Care Reform Bill. In this case, the District Court chose to disregard the corporate legal fiction, writing, "the Court finds that in this case there was no difference between Simmons and Fisher's actions and the actions of [Simmons's corporations]. These corporations were used to allow Simmons and Fisher to perpetuate their bribery schemes. In such a case defendants should not be allowed to hide behind the corporate shell of an enterprise engaged in violating the RICO statute." Order at 6. We agree. At trial, Richard Moore, discussing Fisher's relationship with Simmons, testified that while Fisher did not receive as much money as he thought he deserved from the work on the Motor Fuel Tax Bill, Fisher worked "as

-15-

a partner in the business relationship, and he received compensation as a salary." Trial Tr. at 693. On the basis of that evidence, we hold that the district judge did not err in refusing to allow Fisher to shield himself from criminal forfeiture through the corporate form when, in substance, he was a partner in Simmons's bribery schemes.

IV.

For the reasons discussed above, the judgment of the District Court is affirmed.

It is so ordered.

A true copy.

    Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.