# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1939

_____

United States of America,                    *
                                              *
                  Appellee,                   *
                                              *    Appeal from the United States
            v.                                *    District Court for the
                                              *    Eastern District of Missouri.
Bobby James Willians, Jr., also known         *
as Junior,                                    *
                                              *
                  Appellant.                  *

_____

Submitted: January 15, 2010
Filed: May 20, 2010

_____

Before MELLOY, SMITH, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury found Bobby Williams Jr. guilty of conspiracy to possess with the intent to distribute methylenedioxymethamphetamine (MDMA, also commonly known as "Ecstasy"). Williams was also found guilty of money laundering in connection with the conspiracy. The district court[1] sentenced Williams to 360 months' imprisonment on the two counts. On appeal, Williams argues that the district court: (1) erred in overruling his motion for judgment of acquittal based on insufficient evidence that he

_____

[1]The Honorable Rodney W. Sippel, United States District Judge for the Eastern District of Missouri.

laundered money; (2) abused its discretion by rejecting a jury instruction defining the scope of illicit proceeds in money laundering cases; (3) erred in its calculation of MDMA attributable to Williams when Williams was incarcerated during a period of the conspiracy; (4) erred in applying a four-level role-in-the offense enhancement or, alternatively, the enhancement created an unwarranted disparity among similarly situated codefendants; and (5) erred in failing to dismiss the indictment for a violation of the Speedy Trial Act. For the following reasons, we affirm.

## I. *Background*
### A. *The Money Laundering*

In August 2006, United States Postal Inspector Bryan Witt began investigating packages mailed between Oakland, California, and St. Louis, Missouri, based upon suspicious postal packages observed in St. Louis. Witt reviewed parcel records looking for characteristics common to packages discovered to have contained drugs. Witt identified a significant number of such packages having a similar weight, and all but one were mailed from the same post office in Oakland. Witt obtained copies of eight shipping labels that he believed to be related. With the cooperation of informants Diane Pittman and Rickey Miller, Witt connected Bobby Williams to mail shipments of MDMA to St. Louis.[2]

---

[2]One of the packages was addressed to Pittman. Witt connected Pittman and Rickey Miller to a number of the addresses on the packages. Seven of the eight labels were addressed either to Pittman or Miller or to an address associated with them. Witt placed a parcel watch on each of the St. Louis addresses. On September 8, 2006, Witt was notified that a package addressed to 8837 Granada, St. Louis, 63136, one of the questioned addresses, arrived and had been identified.

Witt took possession of the package. He found that the package had a fictitious return address, originated in Oakland, and was addressed to a fictitious name. The listed sender was Van Le (later identified as Thu Van Dinh, a.k.a. Van Le, Le Van, and "T"). The name "Le Van" was on four other packages. A narcotics-detection dog was called and alerted on the package, indicating the presence of the odor of a controlled substance. Witt obtained a federal search warrant and found the contents

Witt pursued the money-laundering investigation by locating records for a series of postal money orders dating from March 6, 2006, to April 5, 2006. On March 6, 2006, two $1000 postal money orders were purchased with cash in East St. Louis, Illinois, by James Smith, 675 Post, San Francisco, California. Williams negotiated both money orders the following day at a Bank of America in San Francisco, California. Witt identified the account holder as Bobby Williams Jr. at P.O. Box 9169, Richmond Heights, Missouri. Witt determined that 675 Post in San Francisco did not exist.

---

of the box to be four vacuum-sealed bags each containing approximately 1000 tablets. The pills tested positive for MDMA. A postal worker subsequently left an "attempt to deliver" notice at the Granada address. The following day, Shawana Miller, Rickey Miller's sister, attempted to claim the package. The package had been addressed to "Kim Tuck," and Shawana Miller was unable to provide identification in that name and left without the package. Rickey and Shawana Miller returned to the post office shortly thereafter, and Rickey was given the package. He and his sister were then arrested. Both agreed to cooperate, and a series of recorded phone calls were made to the telephone number of the person that Rickey Miller knew to be the source of supply.

Soon after, Witt found the labels for two additional packages that fit the pattern of the original eight. One, the ninth package, was mailed on February 9, 2007, to Bobby Williams. The package was mailed from Oakland but had a return address of P.O. Box 9169 in Richmond Heights, Missouri. The P.O. Box was listed to Bobby Williams Jr. Witt recognized that name as the name of the subject of a money-laundering investigation involving postal money orders being sent between St. Louis, Missouri and San Francisco, California, in April 2006. The tenth suspicious parcel label showed that the package originated in the San Francisco metropolitan area, it used a fictitious name and return address and was destined for St. Louis, Missouri. The return address listed Mike Smith at 516 O'Farrell in San Francisco, California. Witt identified a number of postal money orders associated with Williams that used the name Mike Smith. The ninth and tenth labels were associated back to the narcotics investigation because the return address of 537 Post Avenue in San Francisco, California, a fictitious address, was on one of the original eight packages.

On April 5, 2006, Mike Smith of 589 O'Farrell, San Francisco, California, purchased six $1000 postal money orders from four different post office branches in the St. Louis area. "O'Farrell" had been used on some of the earlier parcel labels. All six were cashed at the same time on April 7, 2006—by Williams—at the same San Francisco Bank of America branch using the same account number as the first two. The bank account records also showed that on April 5, 2006, an additional $3000 was deposited in St. Louis, Missouri to the same San Francisco bank account.[3]

During the investigation, Witt learned that Williams was incarcerated in late May 2006 through sometime in January 2007. Bank and credit card records showed that Williams paid down his Bank of America credit card balance shortly before going to prison by making cash payments of almost $20,000 between May 10, 2006, and May 24, 2006. Once out of prison, almost $7000 in cash deposits were made to Williams's account between May 12, 2007, and June 27, 2007. Western Union records also showed that between December 27, 2005, and May 24, 2006, the day before Williams reported to prison, seven Western Union money orders totaling $13,500 were sent to Williams by codefendants or their relatives.

Southwest Airlines records showed that between December 29, 2005, and November 29, 2007, Williams flew to or from St. Louis, Missouri and Oakland, California, 76 times, spending approximately $24,000 on airfare. Records obtained from the Internal Revenue Service showed that Williams filed no tax returns for tax years 2004–2007.

---

[3]Buying money orders in amounts less than $3000 avoids Currency Transactions Reports (CTRs) which are designed to identify persons involved in money laundering. "Structuring" transactions is often an attempt to avoid triggering the CTR when involved in money laundering.

## B. *Diane Pittman*

Pittman testified that Miller introduced her to Williams, his cousin, because Miller wanted her to take drug money on an airplane to California, accompanied by Williams in March or April 2006. She had been in a relationship with Miller since she was 16 and had lived with him—off and on—since then. Pittman testified that Williams wanted the drug supplier, "T," to meet Pittman and know her face so that she could take over when Williams was incarcerated. An Asian man picked them up at the airport and took them to "T." Williams gave "T" the money. While in California, Williams and Pittman went to a post office where they mailed a package containing MDMA back to St. Louis. Pittman made another ten to 12 trips to Oakland after Williams went to prison on an unrelated charge.

Pittman testified that when Williams left for prison, Williams instructed Miller to continue to mail the money to "T" as if Williams was there. Pittman understood that "T" was going to save the money for Williams to preserve his income during his incarceration.

On June 6 or 7, 2006, St. Louis airport security stopped Pittman and seized $37,251 cash from her. Pittman lied to the Drug Enforcement Agency about who gave her the money to transport, not mentioning Miller or Williams. On July 8, 2006, Jennings, Missouri police officers found and seized marijuana, drug paraphernalia, a firearm, and $41,000 in cash at the home that Pittman shared with Miller. Pittman told the police that the money came from Miller's sale of MDMA. She did not mention Williams. Pittman stopped flying to Oakland at that time. Instead, she started mailing the drug money Miller earned to "T" in Oakland.

## C. *Terrell Terry*

Terrell Terry testified that he had known Miller and Pittman most of his life. In late 2005, Miller introduced Terry to Williams. In early 2006, Miller and Terry were selling marijuana that they received from Williams. Miller received the marijuana

from California through the mail. Terry testified that one day Miller asked Williams if he could get Ecstasy, and Williams said he could get Ecstasy pills for $1 per pill but would charge $2 to $2.50 for them. Miller and Terry bought $3000 worth of Ecstasy from Williams. A group thereafter began to make regular purchases of Ecstasy from Williams, and approximately ten boxes of Ecstasy came through the mail from January 2006 through June 2006, when Terry left the operation and branched off on his own. Williams was present every time the pills initially arrived, and he would then leave when the time came to split up a batch of pills.

The price of pills went up sometime in February, March or April 2006. Terry testified that Miller told him that Williams was raising the price on the pills an extra 25 cents because Williams was going to turn himself in to do some jail time and wanted to make some more money before he was incarcerated. The pills went up to $2.75 per pill. Terry estimated that he personally sold 25,000 to 30,000 pills during his involvement in the scheme. Terry and Miller continued to sell the pills while Williams was incarcerated. Terry testified that Miller told him that Miller was putting the extra money up for Williams.

Williams, along with nine codefendants, was indicted on December 6, 2007, for conspiracy to possess with the intent to distribute MDMA in violation of 21 U.S.C. §§ 846 and 841(a)(1) ("Count I"), and money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) ("Count II"). The total amount of MDMA attributed to the conspiracy was 28,000 units or 7000 grams. The presentence investigation report (PSR) attributed the entire amount of MDMA to Williams.

A jury found Williams guilty of both counts. Williams filed a pro se motion for a new trial based on ineffective assistance of counsel, pro se objections to the PSR and a pro se motion to dismiss for violation of the Speedy Trial Act. Williams's attorney also filed objections to the PSR. Williams denied that the convictions filed in the role-in-the-offense enhancement under 21 U.S.C. § 851 were his convictions. The defense's

objections included general denials of being involved in a conspiracy or laundering money. Williams also challenged the drug quantity allegations, his role in the offense, and his criminal history. The district court denied all of Williams's motions and overruled all of his objections. The PSR set Williams's total offense level at 38 and his criminal history at V producing a Guidelines incarceration range of 360 months to life, with a statutory maximum sentence of 360 months. The court sentenced Williams to 360 months' imprisonment on the drug charge and 240 months' imprisonment on the money laundering charge, to be served concurrently. A six-year term of supervised release (three years concurrent on Count II) was also ordered.

## II. *Discussion*

On appeal, Williams argues that the district court (1) erred in overruling his motion for judgment of acquittal because insufficient evidence supported the money laundering conviction; (2) abused its discretion by rejecting a jury instruction defining the scope of illicit proceeds in money laundering cases; (3) erred in its calculation of MDMA attributable to Williams when Williams was incarcerated during a period of the conspiracy; (4) erred in applying a four-level role-in-the offense enhancement or, alternatively, the enhancement created an unwarranted disparity among similarly situated codefendants; and (5) should have dismissed the indictment for a violation of the Speedy Trial Act. We address each argument in turn.

### A. *Insufficient Evidence*

Williams's sufficiency argument contends that no evidence suggested a design or scheme to conceal the nature, location, source, ownership, or control of the funds transported. Thus, he argues the government failed to prove that Williams laundered money. Williams asserts that the evidence presented at trial instead proved a different crime. According to Williams, the government showed that he structured a transaction to avoid a reporting requirement, a different, lesser offense than money laundering.

We review sufficiency-of-the-evidence questions de novo to determine whether, taking the evidence in the light most favorable to the verdict, a reasonable juror could have found the defendant guilty of the charge alleged in the indictment beyond a reasonable doubt. *United States v. Cruz*, 285 F.3d 692, 697 (8th Cir. 2002). Using this standard, and resolving conflicts in the government's favor and accepting all reasonable inferences that support the verdict, "we will reverse the conviction only where no reasonable jury could have found the accused guilty of the crime charged in the indictment." *United States v. Alyass*, 569 F.3d 824, 828 (8th Cir. 2009) (internal quotations, alteration and citations omitted).

The government charged Williams under 18 U.S.C. § 1956(a)(1)(B)(i). That statutory section covers

> [w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds . . . knowing that the transaction *is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds* of specified unlawful activity.

*Id.* (emphasis added). The main argument between the parties centers on the phrase "designed to conceal." Williams contends that he merely structured the money orders to "avoid a transaction reporting requirement under State or Federal law," in violation of 18 U.S.C. § 1956(a)(1)(B)(ii), not to conceal the nature, location, source, ownership, or control of the illegal money involved in drug transactions. Williams argues that he "merely hid[ ]" the funds, which does not violate the statute per Supreme Court precedent. *Cuellar v. United States*, 128 S. Ct. 1994, 2003 (2008). The government argues that his structuring *is itself* evidence of Williams's intent to conceal and that it presented sufficient evidence of William's intent to conceal the proceeds.

The Supreme Court analyzed 18 U.S.C. § 1956 in *Cuellar*. There, the Court held concealment, under § 1956, requires an intent to conceal the transportation (or transaction) which involves more than merely hiding contraband. *Id*. at 2004. In *Cuellar*, the defendant hid money in secret compartments of his car in order to transport it undetected from Mexico to the United States. *Id*. at 1998–99. The Court held that no evidence suggested the transportation was designed to conceal anything about the money itself (such as the fact that it was obtained illegally); rather, the concealment merely served the goal of transportation. *Id*. at 2004. The Court noted that "[t]here is a difference between concealing something to transport it, and transporting something to conceal it. . . ." *Id*. at 2005 (internal quotations and citation omitted). In short, the Court held that evidence of *why* the money was hidden was more important than the mere fact that it was hidden. The *Cuellar* Court found that the defendant was only hiding the money to make it easier to transport, not to conceal one of the attributes of the money. *Id*. Because the defendant did not intend to conceal the nature, location, source, ownership, or control of the proceeds, the Court reversed the conviction. *Id*. at 2006.

The Fifth Circuit in *United States v. Brown* discussed *Cuellar* in depth, acknowledging *Cuellar's* holding that "*how* one moves the money is distinct from *why* one moves the money. Evidence of the former, standing alone, is not sufficient to prove the latter." 553 F.3d 768, 787 (5th Cir. 2008) (quoting *Cuellar*, 128 S. Ct. at 2005) (emphasis in *Cuellar*). In *Brown*, the defendants were pharmacists convicted of various offenses, including money laundering arising from their distribution of medicines under false prescriptions. *Id*. at 773. Depending on the nature of their activities, codefendants were convicted of money-laundering promotion or concealment. *Id*. As to the money laundering allegations, the government provided evidence from accounts and other records of transactions designed to avoid reporting requirements and otherwise to disguise the nature of pharmacy monies. *Id*. at 778. Ultimately, the government proved § 1956(a)(1)(B)(i) concealment by demonstrating that certain defendants made payments for illegal prescription drugs in structured cash

transactions, that is, in amounts of less than $10,000 so as to avoid federal reporting requirements. *Id*. at 787. Specifically, the Fifth Circuit

> appl[ied] the doctrine of *Cuellar* and h[e]ld that the government's evidence is sufficient to satisfy that standard. . . . By their concealment contrivances, the defendants intended to and did make it more difficult for the government to trace and demonstrate the nature of these funds. While some aspects of "classic" money laundering are absent, many of them are present. The transactions were in cash so that they were not easily tracked. Most deposits were below ten thousand dollars so as to avoid setting off any reporting requirements that might then lead to unwanted attention concerning the funds' nature. Some of this behavior could also be reached by the "structuring" provisions of the money laundering statute, 18 U.S.C. § 1956(a)(1)(B)(ii), but the government charged concealment and has produced sufficient evidence to support those charges.

*Id*. at 787 (internal footnotes omitted).

A Fourth Circuit case is also instructive. In *United States v. Villarini*, the defendant embezzled $83,000, which she later deposited in structured amounts into a bank account in her own name. 238 F.3d 530, 532 (4th Cir. 2001). Villarini was charged with money laundering under § 1956(a)(1)(B)(i) based on four transactions which involved a portion of the cash that she had embezzled. *Id*. All four transactions were in amounts of less than $3000. *Id*. Villarini argued, like Williams, that she should have been charged with structuring under § 1956(a)(1)(B)(ii) not money laundering under (B)(i), however the court disagreed, stating:

> We conclude that the evidence here was sufficient to support the money laundering convictions. Typically, a scheme to deposit a large amount of cash in relatively small increments would be prosecuted pursuant to 18 U.S.C.A. § 1956(a)(1)(B)(ii) (West 2000) as designed to avoid a transaction reporting requirement. *See United States v. Garcia-Emanuel*,

-10-

> 14 F.3d 1469, 1478 (10th Cir. 1994). Nevertheless, the fact that Villarini did not deposit the entire $83,000 in a single bank transaction, and instead made four transactions, each involving less than $3,000, at two-to-four-week intervals, gives rise to a reasonable inference that the transactions were designed to avoid suspicion or to give the appearance that she had a legitimate cash income stream. *See id.* (reversing judgment of acquittal on money laundering count when defendant's wife made purchase by depositing ill-gotten cash in amounts of $7,000, $8,000, and $8,000 into her checking account and then writing a $20,000 check).

*Id.* at 533.

Williams's acts compare to those of the defendant in *Villarini*. Williams and the defendant in *Villarini* each divided a small portion of their illegal proceeds into sums under $3000. Both defendants did so to evade federal reporting requirements. Both defendants used bank accounts in their own names to negotiate the structured deposits. In this case, the government presented evidence that Williams structured transactions with fictitious names ("Mike Smith" and "James Smith") to avoid law enforcement attention concerning the nature and source of his funds. The record evidence shows that Williams repeated these same acts of concealment eight times. Following *Brown* and *Villarini*, this evidence is sufficient to prove concealment under the *Cuellar* standard. Williams's intent to conceal the specific attributes of his illegal funds is clear through his structuring, usage of cash, and manufacturing of a fictitious purchaser. Depositing money as cash with a ficitious name as the purchaser does more than "merely hide" the money from reporting requirements; we hold that a reasonable jury could find that Williams's intent was to conceal the nature of the funds. If Williams's only goal was to avoid reporting requirements, there would be no need to use a fictitious name. The use of "Mike Smith" demonstrates that Williams wanted not only to shield himself from reporting requirements but also to actively conceal the nature or source of the funds.

Williams relies upon *United States v. Herron* to support his argument that he was not guilty of concealment because he used his own name and bank account. In *Herron*, the defendants wired proceeds of a drug operation to their own bank accounts using non-structured amounts. 97 F.3d 234, 237 (8th Cir. 1996). "[T]hey used their own names when sending the money to Chicago, and there is no evidence to suggest that the money was received by any persons other than those named in the Western Union records." *Id*. Therefore, there was no effort to conceal; the defendants in *Herron* merely moved illegal proceeds from one place to another, with no subterfuge. But in the present case, Williams took illegal cash proceeds, transferred them into money orders using both a real and a fictitious name. Williams did, therefore, take affirmative steps towards concealing the nature and source of the funds. Section 1956(a)(1)(B)(i) "requires proof that the purpose—not merely effect—of the transportation was to conceal or disguise a listed attribute." *Cuellar*, 128 S. Ct. at 2005; *accord United States v. Upton*, 559 F.3d 3, 10–11 (1st Cir. 2009); *United States v. Huezo*, 546 F.3d 174, 179 (2nd Cir. 2008). A reasonable jury could conclude that Williams was not just "hiding" money. Disguising where the money came from was his purpose for hiding the cash in the money orders.

## B. *Jury Instruction*

Williams next argues that the district court abused its discretion in rejecting a jury instruction that narrowly defined the scope of illicit proceeds available for a determination of money laundering. Williams objected to the proposed jury instruction, alleging that it was ambiguous. Williams contends that it was unclear whether "proceeds" from criminal activities included gross receipts or only profits. According to Williams, this error dramatically increased the likelihood of his conviction for money laundering. The government responds that the district court gave the appropriate definition of proceeds as "gross receipts" pursuant to our precedents in the context of drug trafficking.

-12-

"We review the district court's jury instructions for abuse of discretion, and this court will affirm if the instructions, taken as a whole, fairly and adequately submitted the issues to the jury." *United States v. Katz*, 445 F.3d 1023, 1030 (8th Cir. 2006) (internal quotations and citation omitted). "A district court has broad discretion in instructing the jury, and jury instructions do not need to be technically perfect or even a model of clarity." *Id.* (internal quotations and citation omitted). "A defendant is entitled to a specific jury instruction that conveys the substance of his request if his request is timely, it is supported by evidence in the case, and is a correct statement of the law." *United States v. Cruz-Zuniga*, 571 F.3d 721, 725 (8th Cir. 2009) (internal quotations and citations omitted). However, a defendant "'is not entitled to a particularly-worded instruction when the instructions actually given by the trial court adequately and correctly cover the substance of the requested instruction.'" *United States v. Long*, 977 F.2d 1264, 1272 (8th Cir. 1992) (quoting *United States v. Lewis*, 718 F.2d 883, 885 (8th Cir. 1983)). We will reverse "only if the district court's alleged erroneous failure to give a particular instruction was prejudicial." *Cruz-Zuniga*, 571 F.3d 725 (internal quotations and citation omitted).

The offense of money laundering includes the use of "proceeds" from an unlawful activity as an element of the offense. 18 U.S.C. §1956(a)(1). Under our precedent, "proceeds" includes anything that is the gross receipt of illegal activity. *United States v. Simmons*, 154 F.3d 765, 770 (8th Cir. 1998) (noting that while circuits across the country have defined the term "proceeds" as alternatively gross revenue or profit, "[w]e think the better view is the one that defines proceeds as the gross receipts of the illegal activity"). Since *Simmons* was considered, however, the Supreme Court decided *United States v. Santos*, 128 S. Ct. 2020 (2008). In *Santos*, a divided Court ruled on the definition of "proceeds" in certain money laundering contexts making it relevant to our review here.

*Santos* involved an illegal gambling operation that did not involve contraband, a key distinction. The justices split as follows: four in the majority held that

-13-

"proceeds" means "profits" in all contexts, *id*. at 2031; the four in dissent held that "proceeds" always means "gross receipts," *id*. at 2035; Justice Stevens, who cast the decisive vote for the majority in his concurrence, concluded that "proceeds" means profits in some cases and gross receipts in others, depending on the legislative history. *Id*. at 2033.

The defendant in *Santos*, who operated an illegal lottery, was convicted of illegal gambling and money laundering promotion. *Id*. at 2022–23. The transactions that formed the proceeds element of the money laundering charge were payments made by the defendant to lottery winners. *Id*. at 2023. The defendant challenged the money laundering conviction on the theory that the payments were not proceeds (in the sense of profits) but rather were simply receipts or revenue used to cover his operating expenses, and therefore they were not sufficient to support a money laundering conviction. *Id*. The Court considered whether "proceeds" under the statute means only profits of the specified criminal activities or whether it includes all receipts. *Id*. at 2022.

Invoking the rule of lenity in light of statutory ambiguity, a four-justice plurality held that the money laundering conviction was invalid because "proceeds" includes only the profits of unlawful activity, not all receipts. *Id*. at 2031. The defendant's payments to his employees and the lottery winners could not serve as the basis for money laundering charges because the monies involved in those payments were not profits but merely receipts necessary to paying his expenses. *Id*.

We recently considered *Santos* for the first time. In *United States v. Spencer*, under similar facts to the present case, a defendant was convicted for conspiracy to distribute cocaine and money laundering. 592 F.3d 866, 870 (8th Cir. 2010). The defendant argued that because the jury instructions in his trial did not distinguish between "profits" and "receipts," his conviction was impermissibly based on receipts

rather than profits. *Id.* at 879. We held that *Santos* does not apply in the drug context. *Id.*

Other circuits have similarly noted that "[t]he precedential value of *Santos* is unclear outside of the narrow factual setting of that case, and the decision raises as many issues as it resolves for the lower courts." *Brown*, 553 F.3d at 783; *see also United States v. Demarest*, 570 F.3d 1232, 1242 (11th Cir. 2009) (distinguishing, based on *Santos*, the definition of proceeds as to drug trafficking from proceeds as to illegal gambling); *United States v. Fleming*, 287 F. App'x. 150, 155 (3d Cir. 2008) (unpublished) (holding that "the term 'proceeds' includes gross revenues for drug sales").

Therefore, we conclude that the district court did not abuse its discretion by providing the jury with an instruction that did not define "proceeds" as the profits of the drug trafficking operation.

## C. *Amount of MDMA*

Williams next argues that the district court erred in its calculation of MDMA attributable to him. Williams contends that his jointly undertaken activity concluded upon his incarceration for an unrelated offense. Williams argues that there was no evidence adduced at trial indicative of a shared purpose once Williams was incarcerated.

A district court's sentence is reviewed under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). Its factual findings in relation to drug quantity are reviewed for clear error. *United States v. Alexander*, 408 F.3d 1003, 1009 (8th Cir. 2005). Its interpretation of the Sentencing Guidelines is reviewed de novo. *United States v. Mickle*, 464 F.3d 804, 807 (8th Cir. 2006).

U.S.S.G § 1B1.3(a)(1)(B) provides that a defendant's base offense level shall be determined

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense. . . .

"A defendant may be guilty of conspiracy even when he is incarcerated while the purpose of the conspiracy is being effected." *United States v. Casares-Cardenas*, 14 F.3d 1283, 1288 (8th Cir. 1994). A quantity of drugs from sales that are foreseeable to the defendant, although he did not actively participate in the actual sale, may be attributed to the defendant. *United States v. Brown*, 148 F.3d 1003, 1008 (8th Cir. 1998). "Factors relevant to foreseeability include whether the defendant benefit[t]ed from his co-conspirator's activities and whether he demonstrated a substantial level of commitment to the conspiracy." *Id*. Additionally, a defendant bears the burden of showing that he withdrew from a conspiracy and must take affirmative actions to do so. *United States v. Granados*, 962 F.2d 767, 773 (8th Cir. 1992); *United States v. Zimmer*, 299 F.3d 710, 718 (8th Cir. 2002). "Mere cessation of activities is not enough" to prove a defendant withdrew from a conspiracy. *Granados*, 962 F.2d at 773; *accord United States v. Maggard*, 156 F.3d 843, 851 (8th Cir. 1998).

The evidence at trial showed that the first known parcel was mailed from Oakland on March 3, 2006. The parcels continued after Williams's incarceration because he had trained Pittman to take his place in the operation. The final parcel arrived in St. Louis on September 11, 2006. After Williams left prison in January 2007, he continued to fly back and forth between Oakland and St. Louis. Between

-16-

February 1, 2007, and December 6, 2007, the date the indictment was issued, Williams completed 44 one-way flights between Oakland and St. Louis.

Williams produced no evidence that he withdrew from the conspiracy. There was testimony that Pittman wanted to cut Williams out of the conspiracy, but in fact Pittman still sent the agreed amount of money to "T" to hold for Williams while Williams was incarcerated. On March 12, 2007, Williams made a cash deposit of $2400 to his Bank of America account. Thereafter, several additional cash deposits were made as he continued to travel between St. Louis and Oakland through the date of the indictment (December 6, 2007) in this case.

Williams concedes that some evidence was presented that he wished to receive some portion of drug proceeds upon his release, but he argues that the test is whether he actually received that benefit to determine his level of commitment to the conspiracy. In fact, "[c]ommitment to the conspiracy, along with degree to which a defendant benefitted from his co-conspirators['] actions, are factors *relevant* to foreseeability[,]" not a determinative test. *United States v. Alexander*, 408 F.3d 1003, 1010 (8th Cir. 2005) (internal quotations and citation omitted) (emphasis added). Based on this record, the district court could conclude that Williams was aware of the conspiracy and still wished to take part in it while he was incarcerated. There was no clear error in the district court's calculation of drug quantity attributable to Williams.

D. *Leadership Enhancement*

Williams next argues that the district court created an unwarranted disparity among similarly-situated codefendants by applying a four-level leadership enhancement to his sentence that other codefendants did not receive. Williams alleges a similarly-situated codefendant received only a three-level role-in-the offense enhancement, although this codefendant directed several people in the retail sale of drugs, and Williams did not. Williams also argues that such an enhancement was unwarranted because the evidence was insufficient to prove that Williams controlled

-17-

or directed other participants in the offense. The government responds that the district court properly applied a four-level enhancement to Williams's Guidelines offense level because he was an organizer and leader of several members of the conspiracy.

We review the findings of fact by the district court in applying a sentencing enhancement based on defendant's role in the offense for clear error. *United States v. Lashley*, 251 F.3d 706, 712 (8th Cir. 2001); *United States v. White*, 241 F.3d 1015, 1024 (8th Cir. 2001). We will find clear error only when we are left "with the definite and firm conviction that a mistake has been committed." *United States v. Lalley*, 257 F.3d 751, 758 (8th Cir. 2001) (internal quotations and citation omitted). "On issues of law (for example, what is the line between an organizer or leader, on the one hand, and a manager or supervisor, on the other), our review is de novo." *United States v. Bahena*, 223 F.3d 797, 804 (8th Cir. 2000). Finally, we note that "a defendant need be only 'an' organizer or leader. He does not have to be 'the' organizer or leader." *Id*. "There can be more than one organizer or leader of a criminal activity. . . ." *Id*.

We review the reasonableness of a sentence for abuse of discretion. *United States v. Dalton*, 404 F.3d 1029, 1032 (8th Cir. 2005). An abuse of discretion may occur when a court "gives significant weight to an improper or irrelevant factor." *United States v. Pepper*, 518 F.3d 949, 952 (8th Cir. 2008) (internal quotations and citation omitted). Where the district court makes an individualized assessment based on all facts presented, addressing the defendant's proffered information in its considerations of the § 3553 (a) factors, such sentence is not unreasonable. *United States v. Stults*, 575 F.3d 834, 849 (8th Cir. 2009).

### 1. *Sufficiency of the Evidence*

Under the Guidelines, an enhanced sentence for a leadership role is appropriate where a defendant was: (a) an organizer or leader of five or more participants; (b) a manager or supervisor of five or more participants; or (c) an organizer, leader, manager, or supervisor of four or fewer participants. U.S.S.G. § 3B1.1 Thus, two

elements operate to enhance a defendant's sentence by two, three, or four levels: a leadership role over at least one other individual and numerosity of participants. *United States v. Logan*, 121 F.3d 1172, 1179 (8th Cir. 1997).

A leadership role is determined by "the nature of defendant's role in the offense, the recruitment of accomplices, the degree of participation in planning or organizing the offense." *United States v. Ortiz-Martinez*, 1 F.3d 662, 677 (8th Cir. 1993) (citations omitted). A court may also look to a defendant's "decision-making authority . . . and the degree of control and authority that the defendant exercised over others." *United States v. Del Toro-Aguilera*, 138 F.3d 340, 342 (8th Cir. 1998) (internal quotations and citations omitted).

"In this circuit, a four-level upward adjustment applies where the evidence shows a defendant is a leader or organizer of an illegal enterprise that involved five or more participants even if the defendant's leadership role did not encompass all the participants." *United States v. Payne*, 119 F.3d 637, 646 (8th Cir. 1997). Factors to consider are:

> [T]he defendant's "exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."

*United States v. Rodriguez*, 484 F.3d 1006, 1015 (8th Cir. 2007) (quoting U.S.S.G. § 3B1.1 cmt. n.4). We recognize that "the line between being an 'organizer or leader,' on the one hand, and a 'manager or supervisor,' on the other, is [not] always clear." *United States v. Delpit*, 94 F.3d 1134, 1155 (8th Cir. 1996). However, "we have said several times that this Court has 'broadly defined' the terms 'organizer' and 'leader.'" *Bahena*, 223 F.3d at 804.

-19-

Williams argues he was a "middleman," and not a leader, because, for example, it was Miller who told Pittman to fly to California. But the record reflects that Miller told Pittman to go to California at Williams's behest because Williams needed someone to take over his role when he was incarcerated. Williams also relies on *Del Toro-Aguilera* in support of his argument that there was insufficient evidence to prove a leadership role. In *Del Toro-Aguilera*, a three-level role-in-the-offense enhancement was overturned because the defendant merely fronted the drugs to another dealer but did not exercise a sufficient amount of control over the operation. 138 F.3d at 343. However, in that case, the only evidence of the defendant's involvement in the drug conspiracy was the fact that he "occasionally fronted drugs" to other members of the conspiracy. *Id.* at 342. Conversely, in *United States v. Flores*, there was evidence that the defendant had "solicited a substantial buyer on behalf of the drug ring, helped finance the [buyer's] trip, played an integral and extensive role in planning [a] transaction . . . and personally managed and ensured that [a] $200,000 deal got done." 73 F.3d 826, 836 (8th Cir. 1996).

In this case, Williams did more than merely introduce Miller to a supplier, as he contends. The government presented evidence showing that Williams acquired the drugs from the California supplier, Thu Van Dinh; introduced Pittman to Dinh so that she could take his place by delivering money to Dinh and mailing the MDMA from California to St. Louis while he was in prison; instructed Pittman how to carry money on an airplane; acquired names and addresses from other persons in order to send the pills to persons other than himself; set the price per pill to Miller and his street distributors; increased the price per pill while he was in prison so he would have money when he got out; and, before surrendering himself to prison, oversaw the distribution of the pills once the shipments were received from California. Williams was the primary link in the acquisition and distribution of the illegal drugs from California to St. Louis. He then sold the pills to others in St. Louis who distributed them. "Typically, this [four-level] enhancement applies to a defendant who employs or otherwise arranges for intermediaries to sell his drugs." *United States v. Sherman*,

262 F.3d 784, 793 (8th Cir. 2001) (internal quotations and citation omitted). "Although the defendant need not directly control his intermediaries in order to be a leader or organizer of the conspiracy, he must do more than sell for resale." *Id*. Williams did much more than sell for resale, and we hold the district court did not err in finding that he was in fact a leader or organizer of this drug conspiracy. The enhancement is affirmed.

## 2. *Sentencing Disparity*

Williams alternatively argues that if an enhancement was appropriate, he still received a four-level enhancement while Miller received only a three-level enhancement, which resulted in an unwarranted disparity between the two codefendants. Williams asks us to at least reduce his enhancement to a level commensurate with Miller's. The government contends that Williams's participation in the conspiracy was one step above that of Miller and a four-level enhancement was warranted.

Williams notes that § 3553(a) seeks to avoid sentencing disparities. Williams again argues that he was just a middleman while Miller was the true leader. "A sentence is not unreasonable simply because it [ ] creates some disparity between sentences." *United States v. Myers*, 503 F.3d 676, 686–87 (8th Cir. 2007) (citation omitted). "Applying [the Guidelines rigidly to avoid disparity] would effectively render the Guidelines mandatory." *United States v. Winters*, 416 F.3d 856, 861 (8th Cir. 2005). "We cannot isolate possible sentencing disparity to the exclusion of . . . all the other Section 3553(a) factors." *Id*. "[E]ach case must be judged on its own facts . . . ." *Id*.

As explained *supra*, Williams's leadership role exceeded Miller's. Williams led Miller and in fact instructed Miller to send him money while Williams was in prison. Williams was the person in contact with Thu Van Dinh, the source. He was the person who obtained the MDMA from Dinh and funneled it down through Miller to the street

distributors. Williams trained Pittman to replace him, traveled with her, introduced her to Dinh, took her to the post office to show her how to address the packages, and paid for her expenses in California until reimbursed by Miller. Williams also set the drug prices for Miller and his subordinates. Williams told Miller that he purchased the pills for $1 each but would sell them to Miller and Terrell Terry for $2.50 each. Williams increased the price to $2.75 per pill just before he went to prison to increase profit for when he was released. Each time a package arrived in St. Louis (before Williams went to prison), Williams appeared with the package and doled the pills out to Miller and his street distributors.

We hold that any sentencing disparity between Williams and Miller was due to their unique roles in the conspiracy and is not unreasonable.

E. *Speedy Trial Act*

Finally, Williams argues that at least 72 days lapsed between the start of the Speedy Trial Act ("Act") clock and the commencement of his trial and submits that he is entitled to dismissal of his case on that basis. The government responds that the Act was not violated. The government alleges that Williams waived his rights under the Act by failing to file a motion to dismiss his charges based on a violation of the Act. Alternatively, the government maintains that Williams was in fact tried in a timely manner.

We review a district court's findings of fact relative to the Act for clear error and its legal conclusions on the issue de novo. *United States v. Contreras*, 341 F.3d 791, 793 (8th Cir. 2003). The defendant bears the burden of proof to show that his statutory speedy trial right has been violated. *United States v. El-Alamin*, 574 F.3d 915, 922 (8th Cir. 2009). When a defendant fails to assert his right to a speedy trial by moving for a dismissal before trial, the right is waived. *United States v. McAdory*, 501 F.3d 868, 872 (8th Cir. 2007) (citing 18 U.S.C. § 3162(a)(2) ("Failure of the

-22-

defendant to move for dismissal prior to trial . . . shall constitute a waiver of the right to dismissal under this section.")).

Under the Act, a federal criminal defendant must be brought to trial within 70 days of the defendant's arraignment or the filing of the defendant's indictment, whichever is later. *See United States v. Gamboa*, 439 F.3d 796, 804 (8th Cir. 2006); 18 U.S.C. § 3161(c)(1). However, the Act provides for a tolling of this 70-day period upon certain delays including "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" 18 U.S.C. § 3161(h)(1)(D), and "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." 18 U.S.C. § 3161(h)(1)(H).

In this case, Williams's counsel did not file a pretrial motion to dismiss the charges. Williams did attempt to file a pro se motion to dismiss. However, because Williams was represented by counsel at the time, the district court did not accept the motion into the record, stating: "IT IS HEREBY ORDERED that the Pro Se Motion to Dismiss Indictment filed by Defendant be stricken as a filing in the Court record, and be retained in the record for informational purposes only."

No other motions to dismiss were filed. Williams's failure to timely file a motion into the record waived his right to seek dismissal based upon the Act when he decided to proceed to trial on December 8, 2008. 18 U.S.C. § 3162(a)(2); *see also McAdory*, 501 F.3d at 872 ("We will not reach the merits of McAdory's Speedy Trial Act claim, however, because he waived his right to assert it by failing to move for dismissal before trial."); *United States v. McFarland*, 116 F.3d 316, 318 (8th Cir. 1997) ("McFarland's remaining claims merit little discussion. McFarland waived his right to assert a Speedy Trial Act violation by failing to move for dismissal before trial.").

-23-

We hold that Williams waived his right to object on the basis of a violation of the Speedy Trial Act because he did not properly file a motion to dismiss before trial, and therefore we need not consider the merits of this claim.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____